## NEWBERRY *v.* STATE.

### Opinion delivered July 21, 1900.

| 68 | 355 |
| 85 | 184 |

| 68 | 355 |
| 188 | 582 |

1. EVIDENCE—DYING DECLARATION.—While decedent was lying on the ground mortally wounded and gasping for breath, his grandfather requested the bystanders to "listen to him while he tells how it happened, before he dies." In response to these words decedent made a statement implicating defendant, and died within a few hours. *Held*, that such statement was admissible as a dying declaration. (Page 357.)

2. SAME—REFUSAL OF INSTRUCTION—WHEN CURED.—The court's refusal to charge that the jury in determining the weight to be given to decedent's dying declaration might take into consideration his mental condition and the fact that defendant had no opportunity to cross-examine was not prejudicial where the court told the jury that it was for them to determine the weight to be given to such statement, and that they could, with other circumstances, consider whether such statement was voluntarily made, and whether it covered all the circumstances of the killing. (Page 359.)

Appeal from Faulkner Circuit Court.

GEO. M. CHAPLINE, Judge.

Z. T. Newberry was indicted for murder of John Bass. Bass was a tenant. He and his wife occupied one room of a house belonging to Newberry. In the other room Newberry had stored wheat. Newberry had two keys to the house, and gave one of them to Bass, retaining the other. Bass, while occupying the house, lost his key. During Newberry's absence, he obtained the other key from Newberry's wife. When Newberry returned home the night before the killing, and found that Bass had got possession of the key, he became excited, took his Winchester rifle, and went to Bass' house, and demanded the key. Bass surrendered the key, but claimed that Newberry had promised to let him have another key if his key was lost, so that the house could be kept locked, and the wheat protected during any absence of Bass and his wife from home. Newberry denied that he had made such a promise, and seemed to be much excited. When Bass told him he could not be responsible for the wheat without a key to lock the house, he replied: "Let the wheat go to hell! If they would take it while you are gone, they would take it while you are there." The next day Bass sent a note to Newberry ordering him to remove his wheat in ten days, or he would prosecute him for disturbing his family. On the afternoon after this note was delivered, Bass and Newberry met in the public road. Newberry was riding a mule, and had his Winchester rifle. Bass was riding a pony, and was unarmed. They each bowed and spoke, but, after they had passed each other and were about forty feet apart, Newberry called to Bass and said, "John what did you mean by sending me that note this morning?" Bass replied that he meant what he said. They thereupon got into an altercation about whether Newberry had promised to let Bass have another key or not, and the end of it was that Newberry shot Bass with his Winchester rifle. The pony upon which Bass was riding turned and ran, and carried Bass about half a mile, when he fell to the ground, and died about five hours afterwards.

Upon trial of the charge Newberry was convicted of voluntary manslaughter, and his punishment assessed at five years in the penitentiary. From the judgment of conviction he appealed.

*E. A. Bolton, John T. Young* and *J. H. Harrod*, for appellant.

Dying declarations must be admitted in evidence with the utmost caution, and never unless it clearly appears that they were made while the deceased realized that death was impending; and the burden of showing this is on the state. 2 Ark. 247; 146 U. S. 140; 17 Ill. 21; 126 Ill. 81. Dying declarations relating to former and distinct transactions are not admissible. Whart. Cr. Ev. (8th Ed.) § 278. The court erred in commenting upon the evidence. 38 Ark. 509; 89 Ill. 90; 51 Mo. 160.

*Jeff Davis, Attorney General*, and *Chas. Jacobson*, for appellee.

The fear **of** impending death may be inferred from circumstances. Underhill, Cr. Ev. § 104. Sending for a physician is no indication of a hope for life. 1 Den. C. C. 1; 103 Ala. 12; 15 So. 824. There is no error in the court's instructions.

RIDDICK, J., (after stating the facts.) The first question raised by the appeal in this case has reference to the action of the circuit judge in permitting declarations made by Bass after the shooting to be introduced as evidence on the part of the state. Appellant contends that it was not shown that these declarations were made under a sense of impending death. The law bearing on the admissibility of dying declarations is very clearly stated in Greenleaf on Evidence as follows: "It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death. But it is not necessary they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind." 1 Greenleaf, Evidence (16th Ed.) § 158; *Dunn* v. *State*, 2 Ark. 229; *Mattox* v. *United States*, 146 U. S.

140, 151; 3 Russell on Crimes (International Ed.) 391; *People* v. *Simpson*, 48 Mich. 474.

Now, in this case Bass was shot in front on the right side of the chest. The bullet passed through him, and came out at his back at a point some lower than where it entered. The effect of this wound was such that Bass reeled in the saddle, and, after being carried by his horse about half a mile from the place of the shooting, fell to the ground, and lay with his face downward, unable to move. A man, who lived near, seeing him fall, came to him, and turned him over. Finding his condition was such that he could not easily be moved, he brought a quilt, and laid Bass upon that while he summoned a physician and the neighbors. The physician testified that the wound made by the bullet in front was as large as his middle finger, and that in the back where it came out it was as large as his thumb. Bass was very weak, and was suffering greatly. The physician saw that the wound was mortal, though he expressed no opinion to Bass. Bass did not ask the doctor for his opinion, nor say anything to show whether or not he had hopes of recovery, but only asked for something to relieve his pain. Among those who came to see Bass was his grandfather. He leaned over Bass where he lay on the quilt, and said, "John, what is the matter?" Bass answered, "I am shot." "Who did it?" asked his grandfather. "Newberry," replied Bass. His grandfather, then still leaning over him, and in the same tone of voice, said: "Now, boys, listen to him while he tells how it happened before he dies." In response to these words of his grandfather, Bass made the statement admitted in evidence as his dying declaration. The statement that he made is not long, but the witnesses say that he was so weak that it took him an hour to make it. He was gasping for breath, and to those who saw him it was evident that death was only a short distance ahead. The probability is that Bass realized his situation, for when his grandfather intimated to him that death was near, and that he should make a statement, he at once commenced to do so, thus showing that he assented to the opinion expressed by his grandfather. He died in five hours after being shot, and about three hours after making the statement.

The admission of dying declarations as evidence in prosecutions for homicide to show the circumstances of the death of the declarant is justified on the ground of necessity. The slayer and the slain may have been the only persons present at the tragedy, and, if the dying declarations of the circumstances of his death made by the deceased could not be shown, it would at times be impossible to punish the guilty. Even when there are other witnesses, they may be unfriendly to the deceased, or may be ignorant of essential facts. For these reasons it is important that the circumstances as they appear to the deceased should also be shown. Especially is this true now, since under modern statutes the defendant is allowed to testify and give his view of the facts. The law therefore admits such declarations when made under a sense of impending death. Whether they were so made being a preliminary question of fact for the trial judge, his finding to that effect will not be overturned when there is evidence supporting it. The circumstances in proof here support the finding of the judge on that point, and such finding must stand.

Such declarations can be admitted only to prove the circumstances attending or leading up to the homicide, and some of the declarations of Bass relating to the controversy about the key were not properly admitted, but we do not see that they were prejudicial. Whether Bass or Newberry was right in the controversy about the key did not justify Newberry in killing Bass. The instruction asked by defendant that the jury in determining the weight to be given the statement of Bass might take into consideration his mental condition at the time, and the fact that defendant had no opportunity to cross-examine, might well have been given, but the court did tell the jury that it was for them to determine the weight to be given to such statements, and that they could, with other circumstances, consider whether such statements were voluntarily made, and whether they covered all the circumstances of the shooting. Taking the whole charge together, we think the case was fairly presented to the jury, and that no prejudice resulted from the refusal to give the instruction asked.

The evidence as presented in the transcript makes out a

strong case of unlawful killing. It is undisputed that when the controversy about the key commenced Bass was sitting on his pony, about forty feet from Newberry, who was seated on a mule. Bass was unarmed. Newberry had a Winchester rifle. Bass stated that he refused to retract a statement to the effect that Newberry had promised him another key, and that thereupon Newberry got off his mule, and shot him. Newberry testified that Bass was riding toward him with his hand in his pocket, threatening to kill him, and that he got off his mule and shot Bass while Bass was ten or twelve feet away on his pony. He admits that at this time he saw no weapons, and Bass had none except a small pocket knife. There was other testimony that the tracks of a pony and a mule were seen in the road at the place where the shooting occurred. The tracks of Newberry where he stood beside his mule at the time he fired, and the tracks of the pony when it whirled in the road after the shot, were seen, and showed that Bass did not advance upon Newberry. A careful consideration of the evidence leaves no doubt in our minds that the killing of Bass was not done in self-defense. The verdict of the jury was as favorable to the defendant as the evidence warranted, and, finding no error, the judgment is affirmed.