Campbell v. The State.

## CAMPBELL v. THE STATE.

1. EVIDENCE: *Production of.*
   It is the usual and regular order in the production of evidence, for the State to call all her witnesses before closing her case, but the general course of examination of witnesses is subject to the discretion of the court, and it may permit a departure from the usual     r.

2. SAME: *Of character of deceased.*
   In criminal prosecutions for homicide the violent and dangerous character of the deceased can not be shown by evidence of isolated facts, or particular acts of violence.

3. SAME: *Dying declarations; their weight.*
   The court can determine only as to the admissibility of dying declarations. Their weight or credit must be left to the jury.

4. NEW TRIAL: *For newly discovered testimony.*
   A motion for new trial upon the ground of newly discovered testimony must be corroborated by the accompanying affidavit of the new witness, or of some other person, if his can not be had.

5. SAME: *Same. Impeaching witness.*
   Newly discovered evidence that goes only to the impeachment of a witness, is no ground for new trial,

APPEAL from *Johnson* Circuit Court.

HON. W. D. JACOWAY, Circuit Judge.

### STATEMENT.

At the December term, 1881, of the Johnson Circuit

Court, D. W. Campbell and S. N. Moore were indicted for the murder of J. M. Wilson.

Upon the trial on the 21st of December, 1881, Ed. Swanson, a witness for the State, testified as follows:

"I know the defendants; was present at the time of the shooting of J. M. Wilson at the house of Alf. Jones, in Johnson county, on the 28th day of January, 1881. The defendants came there about 12 o'clock, on that day, and borrowed a saddle from Jones. They took it away a piece and in about fifteen minutes brought it back and said they were looking for a brown steer. They stood around the fire. Moore laughed and said they were looking for a brown steer. Campbell walked towards the door and turned and drew his pistol and said to Wilson 'consider yourself under arrest', as he leveled his pistol at Wilson and fired. Wilson was standing near the fire, with his side to Campbell, his right hand near his right pants pocket, and the fingers of his left hand inserted in his vest. The ball struck his arm and went through his body and lodged in his clothes. Wilson said 'don't shoot any more boys, you have killed me,' and staggered back and fell, and drew his pistol and threw it out on the floor, and said he would surrender. Moore picked it up, cocked it, and laid it on a box in the room, and cursed Wilson. The shooting was about 12 o'clock on Thursday, and Wilson died from the effects of the wound about 11 o'clock on the following Saturday. He was in his right mind until about half an hour before he died."

Upon cross-examination the witness said: "I don't know where Mr. Jones is. Haven't seen him since last May. I left him in Franklin county and went through the Nation and into Texas. The ball went through the lower part of Wilson's left wrist and entered the left side below the ribs and came out just above the right hip and lodged in his

clothes. Wilson had been going by the name of Centers. He came to Jones' about dark the evening before and said he had had a difficulty that morning and wanted to stay all night. He also said that he was expecting to be arrested. I did not hear him say that he would not submit to arrest.

Charlie Arbaugh (colored), witness for the State, testified : "I was at Jones' house about five minutes after the shooting. When I reached the house Wilson was lying on the floor before the fire-place. He said he had nothing against the men and they had nothing against him, but they were hired to come there and kill him, and had stolen his life without giving him a chance. He said he was going to die and regretted that they did not give him a dead shot. I saw Wilson's pistol which was lying on the fire-board, not cocked. It was a five shooter, and three barrels were loaded. The empty barrels did not seem to have been recently fired ; they looked like they had been fired off a day or two. I was about 150 yards off when I heard the shooting ; heard but one shot ; heard it distinctly, and if there had been more than one shot would have heard it."

John Powers, witness for the State, testified : "I am deputy sheriff of Johnson county. Upon receiving information of the killing, Ledbetter, a deputy sheriff and I went in pursuit of the defendants. We first struck their track in Newton county. They were horseback. Sometimes they traveled the main road and sometimes they didn't. We caught up with them in Stone county, where they were camping out in the mountains. Campbell was asleep and Moore was getting dinner, three or four miles from any house. We slipped up on them, caught Campbell, but Moore escaped and was afterwards arrested in Batesville. Mr. Jones sued out the warrant for them."

Here the defendants' counsel was permitted to recall the witness, Swanson, and ask him the following questions :

Campbell v. The State.

"Did you not say in the presence of J. B. Shepherd, at Jones' house, on the day of the shooting, that you did not see Wilson fall?" Answer. "I did not."

"Did you not say to Dano Smith, or in his presence, on the day of the shooting, that Campbell shot Wilson in self defense?" Answer. "I did not".

"Did you not testify, in your cross-examination, that you had not seen Jones since last May?" Answer. "I parted with Mr. Jones last May and have not seen him since."

Here the State closed except for rebutting testimony.

Pink Boyett, a witness for defendants, testified as follows; "I live in Johnson county; knew the deceased, Wilson, but he went by the name of Centers. He had been at my father's house six or seven weeks, and had picked cotton part of the time. My father had him to clean out a well, for which he claimed two dollars and wanted my father to pay him, and the day before he was shot he came to my father's house and told him that he had come to kill him, and would kill him if he did not pay him the two dollars. My father told him he did not have the money. Wilson called him a damned liar, and said he would kill him if he did not go and get the money. My wife told Wilson she would give him all the money she had if he would not kill the old man, and went and got it and gave it to him; one dollar and ninety cents. He said there was more money there, and kept cursing the old man and shot over his head. Some men at work near by came up and Wilson commenced shooting at a Mr. Boone. Boone ran off and Wilson came back and into the house where I and my wife were and threw his pistol down on me, and my wife knocked it up just as it fired, and the ball cut some of the hair out of her head. He then struck her in the face with the pistol and left, I then got out a warrant for him, and Ledbetter, deputy sheriff, and myself hunted for him that night. I saw the·

defendant Moore and told him my father and myself would
give fifty dollars to any one to capture Wilson and deliver
him to the sheriff.   Moore said he believed he could find
him.''

Boyett's wife and his step-mother gave substantially the
same testimony of the occurence at his house.

Dr. A. C. Johnson, witness for the defendants, testified
that he had lived in Franklin county, and knew Wilson, and
his general character for peace and quiet.   It was very bad.
He was a violent, turbulent and dangerous man.

Here the defendants' counsel offered to prove by the
witness, Johnson, that Wilson went into his store at Pleasant
Hill, in Franklin county, a few weeks before his death, and
asked to buy some tobacco on credit, and on being refused,
stabbed the witness with a knife, without any provocation ;
but the court refused to admit the evidence, and defendant
excepted.

Defendants then proved by other witnesses that Wilson's
general reputation was that of a turbulent, disorderly and
dangerous man.

They then proved by J. F. Ledbetter that he was deputy
sheriff of Johnson county at the time of the homicide, and
had a warrant for the arrest of Wilson which had been sued
out the day before by Pink Boyett, charging him with an
assault with intent to kill.   After detailing his search for and
failure to find Wilson, the State was permitted to prove by
the witness, against the defendants' objections, his pursuit
of the defendants after the homicide, and their capture,
which he detailed substantially as stated by the witness
Powers ; to which examination by the State, on cross-exami-
nation, the defendant excepted.

Dr. J. W. Bell, a physician and surgeon and a witness
for defendants, testified that he was called in to Wilson soon
after he was shot.   The ball entered about one and one-half

inches above the hip bone on the right side and passed out on the left side a little higher than the point of entrance. The wound on the wrist was on the top of the wrist, and was from the inside to the back of the wrist. He judged of the direction of the balls from the character of the wounds; the points of entrance being smooth and the flesh a little inverted, while the places of exit were lacerated and the flesh everted. He thought from the wounds that he must have been twice shot. Witness stated on cross-examination, that Wilson told him that he was commanded to surrender and was immediately shot without any resistance from him. He was rational when he made this statement and knew he was going to die.

David Smith, for defendants, testified that he got to Alf. Jones' about an hour after the shooting, and that the witness, Swanson, told him soon after he got there, that Campbell shot Wilson in self-defense. Wilson told witness that he had never had any difficulty with the defendants and that they would not have shot him if he had surrendered, but that he had rather die than surrender to any man. This statement of Wilson was made the night before he died.

J. B. Stephenson, for the defendants, was with Wilson about four hours after the shooting; and Wilson told him that he had not resisted arrest by the defendants. Witness was again with him the night before he died, and in conversation about the shooting, asked him if he resisted, and he noded his head as if to say he did. He also then asked the witness to write to his mother in Alabama, and to tell her he was the cause of his own death, and said his name was not Centers, but J. M. Wilson.

Witness was well acquainted with witness, Swanson, and Alf. Jones, and met them together in the Choctaw Nation on the 25th day of July, 1881, while on his way to Texas. Spoke to Swanson, calling him "Ed.," and he noded

his head.   Swanson told witness at Jones' on the day of the shooting that he did not see Wilson fall.

Here the defendants closed and the State recalled the witness, Swanson, who testified that he was in the Choctaw Nation with Alfred Jones on the 25th of July, 1881.   When he testified before, he did know which Jones was meant. *He* meant Mr. Steve Jones.   He saw Alf. Jones about a month before the trial, at Fort Smith.   On cross-examination he testified that Steve Jones' name had not been mentioned during the trial and he was not present at the difficulty nor at all connected with it.

Question by the defendant's counsel :   ''Did you not state to D. Linscott, last Sunday, in the court house up stairs, that the defendant Campbell gave Wilson a chance to surrender, but that Wilson refused?''   Answer.   ''I was not on oath then and do not remember what I said to him, but will say that I did not make any such statement to him.''

The State then closed, and the defendants' counsel asked leave to call D. Linscott, and prove by him that the witness, Swanson, did make to him the statement indicated at. the time and place stated in the question ; but the court refused to allow the proof to be made, and the defendants excepted.

### INSTRUCTIONS.

For the State the court gave twenty-seven instructions ; among them the following :

12.   '' It devolves upon the State to prove every material allegation of the indictment, and the law presumes the defendants innocent until their guilt is proven by competent testimony, and beyond any reasonable doubt.''

13.   '' A reasonable doubt is one that is natural and the result of the exercise of reason, and is not an imaginary or · speculative doubt.   It must arise from a fair and impartial consideration of the testimony in the case.''

18. "If you believe that any witness has willfully sworn falsely as to any material fact, you are at liberty to disregard his entire testimony."

The defendant asked ten instructions, which were refused. The 1st, 2d, 3d and 5th have been found by the court to be substantially the same as the 12th, 13th and 18th, given for the State, which are above copied. The 4th, 7th, 8th, 9th and 10th are as follows:

4. "If the jury believe, from the evidence, that the defendants had reasonable ground to believe and did believe that the deceased, Wilson, had committed a felony, and proceeded to arrest him for trial for said felony, and in doing so it became necessary to take his life to prevent his escape, or to overcome forcible resistance offered by him, then the jury must acquit the defendants, whether they had a warrant for his arrest or not."

7. "The dying declarations of the deceased J. M. Wilson, that is, his statements made after he was impressed with the belief that he was going to die, are of as much weight as testimony of witnesses on oath."

8. "In determining whether it was necessary for the defendants to take the life of the deceased, in order to prevent his escape from arrest, or to overcome resistance to arrest, the jury should look to the character of the deceased, and if it has been proven that he was a man of dangerous and desperate character, they should consider that fact in determining the character of the resistance and the necessity for taking life."

9. "It is not necessary for persons arresting offenders, charged with felony, to notify them of the nature of the charge before arresting them."

10. "If the jury believe, from the evidence, that the defendants approached the deceased for the purpose of arresting him for a felony, but before they had time to

inform him of the nature of the charge against him, he began to make resistance, then the defendants were not required to inform him of the character of the charge, but were justified in repelling all the force or resistance offered by him ; and if his resistance was such as to force the defendants to take his life, then they will acquit."

The jury found the defendants guilty of murder in the second degree, and assessed their punishment at five years imprisonment each, in the penitentiary.

The defendants filed a motion for a new trial, assigning among other causes, that since the trial they had learned that the witness, Ed. Swanson, had a short time before the trial, stated to George Dorney, that if the defendants had paid him one hundred and twenty-five dollars he would have left the country, and would not testify against them, but as they had not done so he "intended to go to court and hang or stick them ;" and that they had also learned, since the trial, that the deceased, Wilson, stated on his death bed to James Sparks, that "if Campbell had not shot just when he did, he, Wilson, would have shot Campbell." Many other facts impeaching the evidence of the witness, Swanson, learned since the trial, were assigned as causes for new trial.

They also assigned that since the trial they had ascertained that J. M. Payne had, the day before the shooting, loaned to Wilson three thirty-eight calibre cartridges, and the next day he went to Jones' to see Wilson and saw the pistol, and it contained two loaded and one blank shell.

The motion was overruled ; bill of exceptions filed and an appeal allowed by one of the judges of this court.

*C. B. Moore*, Attorney-General for appellee.

The two principal grounds relied on for reversal are that :

1. Defendants have newly discovered evidence by which they expect to impeach the main witness for the prosecution.

We contend this is no sufficient ground, and the court below did not err in not granting a new trial. *Hilliard on New Trials, pages* 512-513, *sec.* 31. *Ib., p.* 519, *sec.* 40. *Ib., p.* 505, *sec.* 19. *Minkwitz* v. *Steen*, 36 *Arks., p.* 260.

2. Defendants wanted to prove the bad character of deceased, and complain of error in the court below in not allowing the evidence. We 'cite in support of the correctness of the ruling of the court below, *3d Greenleaf on Ev., sec.* 27 (*Redfield's Edition.*)

### OPINION.

HARRISON, J. According to the usual and regular order in the production of evidence, the State should have called and examined the witness, Ledbetter, before closing its case; or if for any reason that could not have been done, it might by the permission of the court have called and examined him as its own witness, after the close of the defendants' case; but the general course of the examination of witnesses is subject to the discretion of the court, and it may permit, as was done, a departure from the usual order. 1 *Green., Ev., secs.* 431, 447; 1 *Bish. Crim. Pro., sec.* 966. The defendants could, if they had wished, have cross-examined him as to the new matter brought out by the State, and we cannot see that any prejudice to them resulted from the irregularity in the examination of the witnesses.

The question the defendants asked Swanson, upon his recall by the State, his answer to which they proposed to contradict by Linscott, was not in relation to any evidence then given by him, but related only to his testimony when on the stand before; and no reason appears to have been shown the court why the contradicting witness could not have been produced before they closed their case. That, as in the case of the examination of Ledbetter, was a matter likewise in the sound discretion of the court, and its refusal

*Margin note: 1. EVIDENCE: Production of.*

to allow them to call the witnesses and so prolong the trial cannot be assigned as error. *Whar. Crim. Ev. sec.* 495.

**2. SAME: Of character of the decea- sed.** The evidence offered as to the assault of the deceased upon the witness Johnson, was very properly excluded. His violent and turbulent character could not be shown by proof of isolated facts or particular acts of violence. It was no part of the *res gestœ*; 2 *Bish. Crim. Pro. sec.* 617; *Eggler* v. *The People*, 56 *N. Y.*, 642; *Franklin* v. *The State*, 29 *Ala.* 14.

The first, second and third instructions, asked by the defendant, were embodied in the twelfth and thirteenth, already given for the State, and in substance and effect the same; and those given for the State were equally as clear and plain; and so also was the fifth asked by them, the same as the eighteenth given for the State, and it could have served no useful purpose to have given those for the defendants, and they were properly refused, and we need not consider or express any opinion in regard to them. *Sweeney* v. *The State*, 35 *Ark.*, 585; *Ford* v. *The State*, 34 *Ark.*, 649.

There was no evidence that the defendants could not have arrested the deceased, if such was their purpose, and they had tried, without shooting him; or that he was, when he was shot, making any resistance to an arrest. Their fourth, eighth, ninth and tenth instructions, were therefore abstract and irrelevant, and were likewise properly refused.

**3. SAME: Dying declara- tions. Their wei- ght.** The seventh also was rightly refused. The jury alone might determine the weight to be attached to the dying declarations of the deceased. Mr. Bishop says: "Judges have sometimes attempted a comparison between the declarations and the testimony of living witnesses as to the weight which the jury should accord them. But evidently such comparisons are impossible, or at least they pertain to the facts of the case, not the law. Like other evidence,

Campbell v. The State.

they are open to observation, but the jury alone are to decide on their effect, giving them such weight as may seem to them under all the circumstances to be just." 1 *Bish. Crim. Proceed. sec.* 1216; *Walker and Black* v. *The State,* 37 *Tex.,* 366; *State* v. *McCanon,* 51 *Mo.,* 160. The court could only determine as to the admissibility of the declarations, and leave the weight or credit which should be given them to the jury. Judges are prohibited by the Constitution from charging juries with regard to matters of fact, and may not comment upon the evidence.

It is a well settled rule that when a new trial is applied for upon the ground of newly discovered evidence, the application must be corroborated by the affidavit of the newly discovered witness, or if that cannot be had, by the affidavits of other persons. No such corroboration was offered as to the newly discovered facts, that the deceased said to Sparks, the day after he was shot, that if Campbell had not shot just when he did he would have shot Campbell.

*4. NEW TRIAL:* For newly discovered testimony.

The newly discovered evidence, concerning the pistol and cartridges, the defendants expected to produce by Payne, was immaterial and irrelevant, and all the rest of the evidence discovered after the trial would only have gone to impeach the credit of the witness, Swanson, and it is a settled and well established rule, that newly discovered evidence that goes only to impeach the credit of a witness is not a sufficient ground for a new trial. *Hill. on New Trials,* 385; 1 *Gra. & Water on New Trials,* 496; *Minkwitz* v. *Steen et al,* 36 *Ark.,* 260; *Wallace* v. *The State,* 28 *Ark.,* 531; *Robbins* v. *Fowler,* 2 *Ark.,* 133.

*5. SAME:* Impeaching witness, no ground for new trial.

As the defendant, Moore, has since the appeal was obtained been pardoned by the Governor, we shall refrain from any remarks in relation to the sufficiency of the evidence to sustain the verdict against him.

The verdict against appellant, Campbell, was sustained by the evidence.

The judgment is affirmed.