## RHEA *v.* STATE.

### Opinion delivered April 29, 1912.

1. STATUTES—TIME OF TAKING EFFECT—PASSAGE.—An act providing that it shall not take effect until ninety days after its passage means that it shall .take effect at the end of ninety days from the date of its approval; and such provision is effective where the approval was subsequent to the adjournment of the Legislature, so that the period of ninety days from the adjournment fixed by the Initiative and Referendum Amendment is not curtailed.  (Page 166.)

2. COURTS—STARE DECISIS.—Public policy requires that decisions of courts of last resort which have been followed and acted upon shall be adhered to, unless great injury and injustice would result. (Page 167.)

3. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—The jury are the sole judges of the credibility of the witnesses and the weight to be given to their testimony, and a verdict sustained by any substantial testimony will not be disturbed.  (Page 174.)

4. HOMICIDE—DYING DECLARATIONS—ADMISSIBILITY.—Dying declarations are admissible only where the death of the person killed is the subject of the charge and the circumstances of the killing are the subject of the declarations.  (Page 174.)

5. SAME—DYING DECLARATIONS—ADMISSIBILITY.—While dying declarations, to be admissible, must be made under consciousness of impending death and without expectation or hope of recovery, it is not necessary that the declarant should expressly state that they are so made, but it may also be inferred from his wounded condition and evident danger, from expressions or statements made to him or in his hearing by physicians or others in attendance, from his manner and conduct, and other circumstances.  (Page 175.)

6. SAME—DYING DECLARATIONS—ADMISSIBILITY.—Declarations of .the decedent are admissible as dying declarations only when they relate to matters about which decedent would have been competent to testify as a witness and must not therefore be mere matters of opinion or belief.  (Page 176.)

7. SAME—DYING DECLARATIONS—PROVINCE OF COURT AND JURY.—The court can determine only as to the admissibility of dying declarations; their weight and credit being for the jury.  (Page 177.)

8. SAME—DYING DECLARATIONS—INSTRUCTION.—It was not error to refuse to give a cautionary instruction to the jury as to dying declarations where the court properly instructed the jury that it was their province to pass upon its weight and credibility.  (Page 178.)

9. EVIDENCE—OPINION—RECOGNITION OF VOICE.—It was not error to permit a witness, who was 250 or 300 yards distant from the scene of the killing, which was in the night time, to testify that he heard the voice of a white man in the crowd at the time of the killing. (Page 180.)

10. WITNESSES—CROSS EXAMINATION OF THE ACCUSED.—It was not improper on cross examination to ask the accused, a white man, in a murder trial relative to his illicit relations with a negro woman. (Page 181.)

11. SAME—REBUTTAL.—Where a witness in a murder case testified that he was present while decedent was being prepared for an operation and that he heard decedent say that he did not know whether accused was in the mob that committed the killing or not, the testimony of another witness that he heard decedent on the same occasion say that accused was in the mob that shot him was competent in rebuttal. (Page 182.)

12. TRIAL—REOPENING CASE.—Where a number of witnesses had testified as to defendant's good character, it was not an abuse of discretion to refuse to reopen the case to permit the introduction of further testimony to the same effect. (Page 182.)

13. INSTRUCTION—CHARACTER.—It was not error to charge the jury in effect that good character is not of itself a defense for committing a crime, but should be considered by the jury, along with other evidence, in determining the question of defendant's guilt. (Page 183.)

14. SAME—LIABILITY OF ACCOMPLICE—WHEN NOT MISLEADING.—An instruction that "an accessory is he who stands by, aids, abets, or assists, or who, not being present aiding, abetting or assisting, hath advised and encouraged the perpetration of the crime," could not have misled the jury to believe that they could convict defendant although he was not present when the crime was committed, where they were further told to acquit the defendant if the evidence raised a reasonable doubt as to whether defendant was present when the crime was committed. (Page 183.)

15. TRIAL—ARGUMENT OF PROSECUTING ATTORNEY.—It was not error for the prosecuting attorney to appeal for the enforcement of the law and ask for a verdict of guilty, stating that he believed they would do so within thirty minutes, where such argument was made in response to an argument made by defendant's counsel. (Page 186.)

16. SAME—CONDUCT OF TRIAL—APPLAUSE BY AUDIENCE.—Applause by the audience at the close of the prosecuting attorney's speech was not prejudicial where the court promptly reprimanded the audience and admonished the jury to pay no attention to the applause. (Page 186.)

Appeal from Jefferson Circuit Court; *Antonio B. Grace*, Judge; affirmed.

*Taylor & Jones, X. O. Pindall* and *G. W. Murphy*, for appellant.

1. The dying declarations of Archard, the testimony of the physicians and the evidence of Bridwell and Smith con-

cerning the dying declarations were improperly admitted as evidence. None of them stand the legal test. The court did not find that the declarations or answers were made under a sense of impending death. 2 Wigmore on Ev. § 25; 9 Kan. 257, 282-5; 4 C. & P. 544; 2 Lewis, Cr. Cas. 148; Underhill on Cr. Ev. 131, § 103.

2. It was error to allow West to give his opinion as to the distinction between a cultured voice and that of a plantation negro. 1 Wharton on Ev. § 43; 94 U. S. 469; 66 Am. Dec. 228; 1 Greenleaf on Ev. § 440.

3. It was error to admit testimony as to the relations of defendant with Mattie Stevenson, and in allowing the prosecuting attorney to question defendant as to same. 70 Ark. 610; 53 Id. 387. The witness Floyd Massey should have been permitted to answer as to defendant's innocent conduct and want of knowledge of the tragedy. 1 Wigmore on Ev. § 293.

4. The belief in the certainty of death, not of mere possibility or probability, must exist to make competent statements as to declarations made just prior to death. 2 Wigmore on Ev. § 1440.

5. There was error in the court's charge: (1) In refusing instructions 1-4 as to unblemished character. Underhill on Ev. § 80, pp. 100-101; 4 Park Cr. Cases (N. Y.), 396; 107 Ala. 133; 66 Wis. 355; 133 N. Y. 609; 49 Cal. 485; 43 N. Y. 6, 8, 9. (2) In refusing 3, 4 and 5, as to imminent death. 2 Wigmore on Ev. § 1448; 1 Gr. on Ev. §§ 158, 159, 160; Underhill on Cr. Ev. § 108; 58 Ark. 77; 52 Id. 345; 63 Id. 382; 70 Id. 156. As to the defense of alibi and instruction 5 see 69 Ark. 180; 59 Id. 279. (3) Instruction No. 7 violated the law as to accomplices. 55 Ark. 395; 51 Id. 173; 37 Id. 274; Mansf. Dig., § 1505, 37 Id. 274; Bish. St. Cr. § 142; 29 Me. 84; 39 Cal. 75; 40 Id. 129; 1 Bishop, Cr. Law § 803; 7 Car. & P. 801. The error was not cured by No. 9. The instructions were conflicting and misleading. 76 Ark. 225. (4) Nos. 15 and 17 misled the jury into the belief that, though perjured, the State's witnesses might stand before them worthy of belief. The closing sentence does not cure the error.

6. The misconduct of the jury was prejudicial; and so was that of the prosecuting attorney. 34 Ark. 632.

7. The testimony as a whole discloses no substantial evidence of guilt. 34 Ark. 632.

*Hal. L. Norwood,* Attorney General, *William H. Rector,* Assistant, *T. Havis Nixon, S. J. Hunt* and *W. B. Sorrells,* for appellee.

1. The dying declarations were admissible. 38 Ark. 495; 58 *Id.* 47; 88 *Id.* 579; 68 *Id.* 355; 81 *Id.* 417; 49 Ore. 46; 103 Ala. 12; 104 Ia. 730; 17 Ala. 618; 115 N. C. 321; 42 Fla. 528; Underhill, Cr. Ev. § 104; 4 Enc. of Ev. 969-971; 106 Ky. 212.

2. The quality of the human voice has been recognized as a means of identification of persons, and is not considered expert testimony. 20 S. W. 753; 34 *Id.* 622; *Ib.* 626; 98 *Id.* 854.

3. Testimony as to illicit relations between defendant and a negro woman was properly admitted, as tending to impeach him. 58 Ark. 478; 46 *Id.* 141; 56 *Id.* 7; 53 *Id.* 390.

4. It was incompetent for Massey to testify as to his conclusions as to defendant's actions and conduct. Wigmore on Ev. p. 291.

5. It was not error to allow the witness Harrison to prove a conviction of the illicit sale of liquors. It was competent as affecting the credibility of the witness. 53 Ark. 390.

6. There is no error in the court's charge. 66 Wis. 355; 133 N. Y. 609; 43 N. Y. 6; 175 Mo. 207; 184 Mo. 276; 193 Ill. 236; 136 Ind. 662; Sackett on Inst. (Brackett) § 2376; 95 Ark. 107; 73 *Id.* 315.

7. The law of dying declarations is well settled in this State. Instruction No. 2 properly refused; the court had no right to point out what inferences should be drawn from any particular facts, or impress the jury with the court's opinion as to their probative force. 55 Ark. 247-8. Instructions 3, 4, 5 are not supported by the authorities. 58 Ark. 47. The admissibility of a dying declaration is determined by the court, not by the jury. 38 Ark. 495; 81 *Id.* 47; 68 *Id.* 355; 81 *Id.* 417; 88 *Id.* 579;

8. The charge as to accessories follows the statutes and decisions of this State. Kirby's Dig., § 1560-1563; 37 Ark. 274.

9. Giving an erroneous instruction is not ground for reversal unless prejudicial. 59 Ark. 431.

10. Instructions 15 and 17 are sustained by 77 Ark. 436; 55 *Id.* 242; 68 *Id.* 336; 95 *Id.* 169; 82 *Id.* 540; 91 *Id.* 562; 98 *Id.* 318.

11. There was no misconduct of the jury. 44 Ark. 118; 57 *Id.* 8; 29 *Id.* 254; 95 *Id.* 428;

FRAUENTHAL, J.   At the August term, 1911, of the Desha Circuit Court, the defendant, W. S. Rhea, was indicted upon the charge of murder in the first degree.   It was alleged in the indictment that on May 13, 1911, one Jim Hubbard did kill and murder Vital Archard by shooting him with a gun, and that the defendant was present and did aid, abet and encourage said Hubbard in the commission of said crime. The trial resulted in a verdict finding the defendant guilty of murder in the first degree.   He filed motions in arrest of judgment and for a new trial, and, both being overruled, he has prosecuted an appeal to this court.

The indictment was returned at a regular term of the Desha Circuit Court begun on the fourth Monday of August, 1911.   It is contended that the term thus held by the Desha Circuit Court was at a time not authorized by law, and, for this reason, the indictment then returned and all proceedings had thereunder are illegal and void.   The Legislature of 1911 enacted a statute, which was approved on May 26, 1911, changing the time of holding the terms of the circuit courts in the Eleventh Judicial Circuit and fixing the time of holding said courts in Desha County on the third Monday in January and the fourth Monday of August of each year.   (Acts 1911, p. 283.)   The statute concludes with the provision that "this act shall take effect and be in force ninety days from and after its passage."   It is contended that, under the constitutional amendment commonly known as the Initiative and Referendum, the passage of the above statute did not occur until ninety days after the adjournment of the General Assembly, and that it did not become effective until ninety days after that time had passed, in other words, not earlier than 180 days after the adjournment of the General Assembly, which was later than August, 1911, at which time the term of court was held wherein this indictment was returned.  · This contention is the same as that which was made in the case of *Jackson* v. *State,* 101 Ark. 473.   The same statute was involved in that case, and it was determined that it was in force in August, 1911, when the term of the Desha Circuit Court was held, at which Jackson was tried and convicted of a felony.   In that case this court said:   "We are urged to consider the section of the statute

postponing its operation ninety days after passage to mean ninety days after the end of the period allowed for reference to the people. We are unable to reach the conclusion that that is the correct construction, for it would do violence to the plain language of the statute which declares that it shall take effect and be in force ninety days after its passage. The act was passed, within the meaning of the language used, when it was approved, and the ninety days' postponement ran from that date. The Legislature had the power to lengthen, but not to shorten, the time for putting the statute into operation, and it was the manifest intention of the lawmakers to postpone the operation of the statute that length of time regardless of any further postponement of its operation which might result from the length of time given for reference to the people after the adjournment of the session." The decision in the case of the *Arkansas Tax Commission* v. *Moore*, 103 Ark. 48, does not, we think, conflict with the ruling made in the Jackson case. In the Tax Commission case, this court referred to the Jackson case, and there said: "The court there, in ascertaining the legislative intent, concluded that it was meant to postpone the operation of the statute for a period of ninety days after its approval by the Governor, * * * without regard to the reference period or whether or not the referendum provision was in force. That construction of the statute which we then had under consideration had little, if any, bearing on the question now presented. We do not find the construction adopted in that case to be in conflict with the views now expressed." According to the construction placed on this statute by this court in the Jackson case, the Legislature determined that the act should be in force ninety days after its approval by the Governor. No referendum of this act was demanded, and, the August term of the Desha Circuit Court having begun more than ninety days after the adjournment of the Legislature and the approval of the act by the Governor, it was then in full force and effect. That was the decision of this court then made, and must be followed unless overruled. It is essential that there should be stability and uniformity in the construction and interpretation of the law. The conduct of the affairs of State, the rights and interests of individuals, the uniformity of the enforcement of the law and the proper administration of justice re-

quire in these matters that there should be settled rules. It becomes necessary, as a general rule and as a matter of public policy, to uphold the principles which are announced in the decisions of the courts of last resort after they have been followed and acted upon. Relying upon these decisions, public policies are formulated, and the property rights of individuals acquired and fixed. Where this has occurred, the decisions thus made should, unless for very cogent reasons to the contrary, be upheld. This is especially true where there has been a series of like decisions made upon the same question, but this policy should also be carried out even where there is only one decision, when the overruling of such decision would affect injuriously. the interests of the State or the property rights of individuals which have become vested. As is said in the case of *Roane* v. *Hunter*, 6 Ark. 525: "Where a principle has been declared and acquiesced in, it should be adhered to, unless great injury and injustice would result." This doctrine is especially applicable to those decisions involving the constitutionality of a statute, both in its subject-matter and operation. *Smith* v. *Henry*, 7 Ark. 207; Ex parte *Hunt*, 10 Ark. 284; *Miller* v. *Fraley*, 21 Ark. 38. In the case of *Jackson* v. *State, supra,* it was decided that this statute had been duly passed, and that it was in full force and effect at the August term, 1911, of the Desha Circuit Court. The statute affected the time of holding the circuit courts in Jefferson, Lincoln and Desha counties. Acting upon the authority of that case, said circuit courts have been held in accordance with that statute. Cases in those courts involving the rights of person and of property have been determined and those rights decided and fixed. Causes in which the State is interested have also been passed upon and determined. The interests of the State and of those individuals require an adherence to the decision made in the Jackson case, unless a grave injury or injustice will be done thereby. The defendant could not be injured in any of his substantial rights because an indictment for murder in the first degree was found at any particular term of the Desha Circuit Court. The determination of his guilt or innocence of the crime charged against him by such indictment would not be affected by the time at which the indictment was returned. He could not thereby be deprived

of any substantial right to which he was entitled in order to obtain a fair and impartial trial. An objection to an indictment, therefore, upon this ground alone, is wholly technical, and not founded upon any substantial merit. On grounds of public policy, then, we do not deem it necessary or proper to again inquire into and consider the question as to whether or not the proceedings had at the August term, 1911, of the Desha Circuit Court are valid. The regularity of that court and the validity of the proceedings had at that term thereof have been determined by the former decision of this court, and to that decision we now adhere.

A number of grounds are set forth in the defendant's motion for a new trial and pressed upon our attention why the judgment of conviction should be reversed. These grounds may be grouped under the following heads: It is contended (1) that there is not sufficient evidence to sustain the verdict which was returned; (2) that the court erred in its rulings relative to the admissibility and rejection of certain testimony; and (3) that it erred in rulings made by it in giving and refusing certain instructions.

1. The defendant was the manager of a plantation situated in Desha County, about ten or twelve miles from Dumas and known as the Lenox place. He was the only white man on this plantation, and had employed under him a number of negroes as tenants and laborers who worked and cultivated the place. Among these was one Grant Sanders, who, prior to coming to the Lenox place, had lived at Farrell, Arkansas. There he had been arrested and placed under bond for the crime of assault with intent to kill, on which a negro by the name of West was surety. Subsequently a charge of murder was lodged against Sanders, upon which a warrant of arrest was issued, and the surety on said bond desired to surrender him into custody. The deceased, Vital Archard, was a constable residing at Farrell. Into his hands the warrant against Sanders was placed for execution, and said bail authorized him to arrest him for the purpose of surrendering him into custody. On May 13, 1911, Archard and West proceeded by rail to Dumas for the purpose of going to the Lenox place and there arresting said Sanders. At Dumas Archard met the defendant, and told him that he was seeking

Sanders for the purpose of making his arrest. Later he pro-
ceeded in a wagon obtained from a fisherman, in company
with said West, to the Lenox place, where he arrived about
4 o'clock on the afternoon of the same day. In the mean-
while, defendant sought a justice of the peace at Dumas and
asked him if Archard had a right to arrest Sanders. After
examination, the justice of the peace told him that Archard
was authorized to make the arrest upon a surrender made by
his bail. The defendant then said: "I'm glad you found
that law. I had made up my mind to take my gun and not let
him have him." Thereupon the defendant telephoned to the
manager of a plantation situated about one mile from the Lenox
place, and requested him to send a message to Grant Sanders,
telling him that there was "an officer on the way after him,"
and "for him to hide out until he got home." This was done,
and when Archard and West arrived at the Lenox place
they found that Sanders was in hiding on an adjoining farm,
but succeeded in arresting him. At the request of Sanders,
they remained with him at the Lenox place until the de-
fendant's return. The defendant had gone to Dumas in the
early morning with a number of laborers and wagons for the
purpose of securing certain freight. He left Dumas late in the
evening in company with his laborers and wagons, and arrived
at the Lenox place about 8 or 9 o'clock of the same evening.
At the gate near his dwelling he met Archard and West,
who had said Sanders with them under arrest. There is a
sharp conflict in the testimony on the part of the witnesses on
behalf of the State and that of the defendant as to what was
then said, and what was thereafter done, and there is quite
a discrepancy in the testimony of some of the witnesses on
behalf of the State as to some of the details as to what was
then said and as to what happened.

From the testimony on the part of the State, however,
the jury, we think, were warranted in finding that the defendant
and Archard talked for a short time at the Lenox gate.
The defendant offered to go upon Sanders's bond, and
Archard told him that he could not do so for the reason that
he had a writ charging him with the crime of murder, and
that he had to take him back to Farrell for trial, where
he could go and make the bond. He asked the defendant

what he thought about it, and the defendant replied: "Not a damned thing." Thereupon Mr. Archard and West, with Sanders under arrest, proceeded on foot to Dumas. After they left, the defendant said that he was going to overtake Archard and take Sanders away from him and bring him back; that he would not permit any one to come on his place and take his hands away when he forbade it. Thereupon he ordered his hostler to get mules for the negroes, whom he directed to accompany him, and a negro to get from the cabins certain guns and pistols with which to arm them. In company with five negroes who worked upon his place, the defendant then proceeded to overtake Archard. He was riding a horse and the negroes were on four mules, two of them riding double. The negroes who thus accompanied him were Jim Hubbard, Major Davis, Joe Berry, Robert Johnson and Mack Tucker, and all of them testified on behalf of the State in the trial, except Hubbard and Tucker. They overtook Archard and Sanders about two miles from the Lenox gate. Sanders had a handcuff upon his wrist which Archard was holding, and West had been sent ahead to obtain a conveyance, and was at the time about 200 or 300 yards distant from them. As the pursuing party rode up, one of them cried out for Archard to hold up, and another cried out: "Turn that damned negro loose," and almost immediately the defendant, who was in the rear of Archard, fired his pistol at him, and Hubbard, who was somewhat in front of him and to his side, shot Archard with a shotgun. The negroes accompanying the defendant fled back to the Lenox place, principally on foot, and the defendant returned upon his horse. Sanders also fled to the Lenox place, where a laborer, at defendant's direction, filed the handcuff from his wrist. West fled to Dumas upon a mule which he obtained from a party further along the road. There he told of the shooting, and an officer and others went to the scene of the killing. Archard had fallen upon his face in the road and was paralyzed in his lower extremities. A pistol or rifle shot had taken effect in his back about the shoulder, penetrating straight in, and a shotgun wound was found at the juncture of the neck and shoulder, about the seventh cervical vertebra, severing, to some extent, the spinal cord. He was taken to Dumas, where he arrived about 7 or 8 o'clock on the

morning of May 14, and taken immediately to the office of Doctor Isom, who, in conjunction with other physicians, attempted to perform an operation on him, but Archard died within thirty minutes thereafter, while still on the operating table. This, in substance and briefly stated, is the state of facts made out by the testimony adduced on behalf of the State.

The defendant testified that when he met Archard in Dumas, and was told by him that he desired to make the arrest of Sanders, he offered to assist him in making the arrest, and invited him to go to his house and remain overnight. He stated that Archard was drinking, and under the influence of liquor, and refused his request. He testified that he had sought information from the justice of the peace as to the right of Archard to arrest Sanders, but denied that he had said that he had before that made up his mind to take his gun and not let Archard have him. He also stated that he had telephoned from Dumas requesting that a message be sent to Sanders telling him to hide out until he returned, but that he did this because he feared that Sanders, on account of his dangerous character, might do Archard an injury, and that he could help Archard to arrest him when he got home. He testified that when he got to his gate on the Lenox place he saw Mr. Archard and West, and Sanders in their custody, and that Sanders asked him to come to his rescue; that he told him he couldn't do anything for him; that Mr. Archard said that Sanders would be tried Monday, and thereupon Sanders asked him to come to the trial; that he told him he could not do so, and would not go on his bond. Thereupon Archard and West and Sanders left. He stated that, as they left, one of his negro laborers, Joe Berry, who was acquainted with West and Archard, walked off with them a piece, and when he returned he said that he thought that he could persuade West to turn Sanders loose; that some of the negroes then said that they would go out and endeavor to get Sanders turned loose. He testified that thereupon he told them not to do anything of the kind, for the reason that the officer did not have any right to turn Sanders loose, and that he then went into his house. He stated that he then engaged in reading his correspondence and entering items in his account book until he.

retired. He testified that he was not along with the negroes when Archard was shot, and knew nothing of the homicide until the afternoon of the following day, when he was arrested.

The witnesses on behalf of the State, Joe Berry, Major Davis and Robert Johnson, who were in the crowd or mob which pursued and overtook Archard, were all indicted for his murder. Each of them testified that the defendant Rhea organized and led the crowd, and was present when Archard was shot and actually fired the first shot, which took effect in his back. It is contended by counsel for defendant that these parties were all negroes and the friends of the negro, Sanders, who was under arrest, and that these five negroes had conceived the plan of rescuing Sanders, and alone did the shooting which resulted in Archard's death. It is insistently argued that these negroes had testified that the defendant had organized and led the crowd, and that they had accompanied him on account of fear, in order to gain immunity for themselves or to lessen any punishment that might be visited on them for this crime. To sustain this contention, they point to the fact that two of these witnesses stated immediately after the homicide, at the coroner's inquest, that the defendant was not in the crowd which followed Archard and shot him, and also to contradictions and inconsistencies in their testimony. They also argue that while Sanders and another witness testified that the defendant was in the crowd, leading it, and West testified that the voice crying out "Turn the damned negro loose" was that of a white man, all these witnesses are negroes, and, on this account, had conspired to implicate the defendant in order to protect the negroes, who are also indicted for the murder of Archard.

The witnesses, Berry, Davis and Johnson, were accomplices in the commission of the crime, and the defendant could not be convicted thereof upon the uncorroborated testimony of these witnesses. But there were other witnesses, Grant, Sanders, Sam Kelley and Rosa Thomas, who testified to facts and circumstances which showed that defendant led the crowd or mob, and was present at the time Archard was shot, and these witnesses were not accomplices in the perpetration of this crime.

All these witnesses appeared before the jury and gave

their testimony. It was peculiarly the province of the jury to pass upon the credibility of these witnesses and the weight which they should give to their testimony. The evidence which they gave was not only of a substantial nature fastening upon the defendant the guilt of this crime, but, if they were credible witnesses, the proof of his guilt was direct and positive. It has been repeatedly held by this court that the jury are the sole judges of the credibility of the witnesses and the weight to be given to their testimony; and if there is any substantial evidence adduced at the trial which sustains the findings of the jury as to questions of fact, its verdict will not be disturbed by this court upon appeal. This rule has been followed so uniformly that, even if there were no other facts or circumstances in the case pointing to the defendant's guilt, we would not feel justified in saying that the verdict returned was not sustained by sufficient evidence. *Hubbard* v. *State*, 10 Ark. 378; *Dixon* v. *State*, 22 Ark. 213; *McCoy* v. *State*, 46 Ark. 141; *Williams* v. *State*, 50 Ark. 511; *Ferguson* v. *State*, 92 Ark. 120. But other material testimony was introduced which tended to prove that the defendant was with this crowd or mob which compassed the death of Archard. On the day following the shooting, a veterinary surgeon was taken to the place where Archard was shot and found the tracks of a horse. Its fore feet were shod and its hind feet were unshod. He measured these horse tracks, and then went to the horse lot near the defendant's house, and where the defendant kept his horse, and there found horse tracks to which he applied the measure he had taken at the place where Archard was shot, and they corresponded in size as well as being shod in front and not behind. The theory of the defendant was, and the testimony which he adduced tended to prove, that all the negroes in the pursuing crowd rode on mules. The testimony tended further to prove that there was only one horse which was used upon the place for riding, and that this horse was owned and ridden by the defendant. The deceased Archard made what is claimed by the State to have been a dying declaration, in which he said that he did not know who had shot him, but that a white man was in the crowd that did shoot him, and that this white man was Rhea. The testimony of defendant himself contained statements which might be considered by the jury as inconsistent

with truth or improbable. He stated that on the morning when he met Archard at Dumas, he was friendly with him, and offered him assistance in arresting Sanders, including a conveyance in which to take Sanders away, and yet, when Archard left his place with his prisoner in the darkness of the night on foot for Dumas, a distance of ten or twelve miles, he gave no invitation to remain overnight, and offered him no means of conveyance, though they were at hand. He admitted that he asked the justice of the peace for information as to Archard's authority to arrest Sanders, but denied the statement of the justice that he had said that he was glad that he had found the law, because he had made up his mind to take a gun and not let him have him. He admitted that he had sent a message to Sanders that an officer was on his way to arrest him and for him to hide out, and explained it by saying that he did this only because he feared that Sanders might do Archard an injury.

Without further detailing the testimony and the inferences reasonably deducible therefrom by the jury, we are of the opinion that there was substantial evidence adduced upon the trial of this case sufficient to sustain the verdict which was returned. It follows that the verdict can not be set aside upon the ground that there was not sufficient evidence to sustain it.

2. It is earnestly contended by counsel for the defendant that the court erred in admitting the statement, made by the deceased, Archard, that the defendant was in the crowd that shot him, upon the ground that it was not a dying declaration. It is urged this statement was not a dying declaration because (1) it was not made by Archard under a sense of impending death, and (2) because, from the physical facts adduced in evidence, Archard could not have seen or known that defendant was in the crowd, and therefore it was but the expression of his opinion, and not a statement of fact which he made.

Dying declarations are admissible only in cases of homicide where the death of the person killed is the subject of the charge and the circumstances of the death are the subject of such declarations. It is well settled that such declarations must be made, not merely when the declarant is *in articulo mortis,* but he must be at the same time under the

consciousness of impending death and without expectation or hope of recovery. It is not necessary, however, that the declarant should, at the time of making the declarations, state that he makes them under a sense of impending death; if it satisfactorily appears from the evidence in any mode that the declarations were made under that consciousness, then they are admissible. This may be shown directly by the express language of the declarant; it may also be inferred from his wounded condition and evident danger, from expressions or statements made to him or in his hearing by physicians or others in attendance, from his manner and conduct and other circumstances shown in the case. The principle is thus stated in the case of *Dunn* v. *State*, 2 Ark. 229: "The only satisfactory principle upon which the dying declaration of a person deceased can be admitted to establish the circumstances of his death appears to us to be that they were made at a time when, in the mind of the deceased, all expectation of recovery was yielded up and supplanted by the conviction that he would certainly die by reason of the injury received and under which he then languished; * * * and, therefore, to warrant their admission, it must be shown, in the first place, that the declaration was made under an apprehension of impending death. This may be collected from the nature and circumstances of the case, although the declarant did not express such an apprehension, nor is it essential that the party should apprehend immediate dissolution." See also *Campbell* v. *State*, 38 Ark. 498; *Walker* v. *State*, 39 Ark. 221; *Newberry* v. *State*, 68 Ark. 355; *Fogg* v. *State*, 81 Ark. 417; *Ward* v. *State*, 85 Ark. 179; *Jones* v. *State*, 88 Ark. 579; *Robinson* v. *State*, 99 Ark. 208.

It is equally well settled that the declarations of the deceased are admissible only as to those things about which he would have been competent to testify if sworn as a witness in the case. They must, therefore, relate to facts only, and not be mere matters of opinion or belief. If, from the physical facts, it necessarily appears that the deceased could not have known or had the knowledge of the matters he declares as facts, then it follows that they are matters merely of belief or opinion and therefore inadmissible. *Jones* v. *State*, 52 Ark. 345; *Berry* v. *State*, 63 Ark. 382; *Baker* v. *State*, 85 Ark. 300. Another well settled principle is that the court can determine only

as to the admissibility of the dying declarations.  The court must ascertain the primary facts relative to their admissibility and become satisfied that the requisite predicate has been established.  When, from the testimony, the court is satisfied that the statements made by the deceased were dying declarations, it becomes its duty to admit them in evidence.  It is then the province of the jury to determine the circumstances under which they were made and the weight and credit that should be given to them.  In the case of *Evans* v. *State*, 58 Ark. 47, this court said: "It is within the province of the court to hear the circumstances under which the declarations were made and to determine whether they are admissible, but, after they are admitted, it is within the province of the jury to weigh them and the circumstances under which they were made and give to them only such credit upon the whole evidence as they may think they deserve."

In the case at bar it was shown that Archard was shot and mortally wounded about 9 or 10 o'clock at night.  He lay for several hours in the road, unable to move, because his lower extremities were paralyzed.  He was carried to Dumas, and there taken to a doctor's office where preparations were made for an operation.  According to the testimony of the attending physicians, he was rational and conscious and possessed of his senses of hearing and seeing.  Before the operation was performed, he expressed an objection to taking chloroform. In his presence, the physicians made preparations for the operation; they sterilized their instruments, put on their operating aprons and placed him upon an operating table.  At that time Mr. Bridwell, a justice of the peace, came into the office, and said that he desired to get a statement from Mr. Archard before the operation was performed.  Mr. Archard then turned his head to one of the physicians and said, "How badly am I hurt?"  This physician in reply tried to make his condition as mild as possible, and thereupon another physician said, "Doc, why don't you come clean and tell the man he's going to die?"  The first physician then said, "Mr. Archard, you are badly wounded, and your chances for recovery are slim; and if you have a statement you had better make it."  All this was said while Mr. Archard was lying on the operating table and in his hearing.  Thereupon, in answer to

questions, Archard stated in substance that a mob had attacked him, that he did not know how many were in the mob or who had shot him, but that a white man was in the mob and that the white man was Rhea. Within thirty minutes after making this statement and while still upon the operating table, Mr. Archard died.

In the case of *Newberry* v. *State, supra,* the dying declarations of the deceased, Bass, were admitted. In that case the attending physician saw that his wound was mortal, but expressed no opinion to Bass relative to it. Bass did not ask the doctor for his opinion, and said nothing to show whether or not he had hopes of recovery. A relative leaned over him, and asked him what was the matter, and he said he was shot. The relative then said to others present, "Now, boys, listen to him while he tells how it happened before he dies." In response to these words, Bass made his statement. This court held that his statement was admissible as a dying declaration; and in regard thereto said: "The law, therefore, admits such declarations when made under a sense of impending death, whether they were so made being a preliminary question of fact for the trial judge. His finding to that effect will not be overturned when there is evidence supporting it. The circumstances in proof here support the finding of the judge on that point, and such finding must stand." We are of the opinion also that, although the testimony on the part of the State tended to prove that defendant was in the rear of deceased when he shot, the physical facts were not such as to justify the setting aside of a finding that deceased recognized defendant by seeing him as he turned aside from the road or by the sense of hearing when he demanded that he turn Sanders loose. *Walker* v. *State,* 39 Ark. 221. The court did not err in admitting the statements made by Archard in this case as a dying declaration.

In regard to this dying declaration, the defendant asked the court to instruct the jury in effect that they should take into consideration the fact that when it was made the defendant had no opportunity to cross examine the deceased, and that they should consider and weigh it with caution; that they should consider his opportunity or lack of opportunity,

or his means of seeing and knowing the matters to which the declaration relates at the time of receiving the injury and at the time of making the declaration, including his physical and mental condition. He further requested the court to instruct the jury, in substance, that if the declarant had any hope of recovery at the time of making the dying declaration, or if he did not have adequate opportunity for knowing the truth of the statements made, or if the declaration was really an expression of his opinion, then the statement made by the deceased should have no weight as evidence against the defendant.

As an abstract proposition of law, it has been said by commentators on the law of evidence and by courts of high authority that the testimony of dying declarations should be received with caution and weighed with care for the reason that such declarations are made in the absence of defendant and without opportunity to cross examine the declarant, and also because the repetition thereof is made by witnesses who may be liable to mistake by reason of a lack of clear and exact expression of the deceased or of a misunderstanding as to his meaning. Dying declarations, however, are admitted in evidence as if made under all the solemnity and binding effect of an oath. Like all other testimony introduced at the trial, they should be considered and weighed by the jury with care. Our Constitution provides that the trial court shall not charge the jury as to matters of fact; and this court has repeatedly held that it is erroneous to give instructions that bear upon the weight of the evidence. We do not think it necessary in this case to determine whether or not it would be proper under our Constitution to give to the jury a cautionary instruction relative to the testimony of dying declarations. The refusal to give such an instruction could not be prejudicial when the court has properly instructed the jury as to their absolute province to pass upon the weight of such testimony and the credibility of the witnesses narrating it. Such an instruction was given in this case. The matters set out in the instructions requested by defendant were the very reasons why the testimony of dying declarations should be considered and weighed with care, and these matters therefore were in themselves cautionary. The matters set out in these requested instructions, the substance

of which we have above stated, were, we think, covered in every essential particular by the following instruction which was given by the court to the jury: "10. The admissibility of a dying declaration made by one who has been wounded is a question for the court alone to decide; the weight that should be given to it—its probative force as evidence—is a matter solely within the province of the jury. In this case the court has admitted in evidence the dying declaration of Vital Archard, and you should consider it in connection with all the other evidence in the case. The interest of the deceased, his mental and physical condition at the time, the circumstances under which it was made, his means of knowing the facts stated by him in his declaration, and all the other evidence in the case should be considered by you in determining whether or not the statements so made by him were true." As was said in the case of *Newberry* v. *State, supra:* "The instruction asked by defendant that the jury in determining the weight to be given the statements of Bass might take into consideration his mental condition at the time and the fact that defendant had no opportunity to cross examine might well have been given, but the court did tell the jury that it was for them to determine the weight to be given to such statements, and that they could, with other circumstances, consider whether such statements were voluntarily made and whether they covered all the circumstances of the shooting. Taking the whole charge together, we think the case was fairly presented to the jury, and that no prejudice resulted from the refusal to give the instruction asked."

In the trial of the case, the witness West testified that just before the shooting he heard one of the crowd or mob cry out: "Turn the damned negro loose!" At that time West was about 250 or 300 yards away, and was not able to recognize any member of the crowd or to determine or to say from seeing them whether any of them was a white man. In describing the tone of the voice he said, "It was a cultured voice;" that he could distinguish the voice of a plantation negro from that of a cultured white man, and that, in this instance, it was the voice of a white man. We think that this testimony was admissible. The recognition of the voice is a conclusion reached through the sense of hearing, as the recognition of

the appearance of a person is a conclusion reached through the sense of sight. It is not a mere matter of opinion. It is admissible as direct and positive evidence, the weight of which is for the jury's determination. One may by the sense of hearing recognize the voice of a person with which he is familiar, and may likewise recognize and know the difference between the voices of persons of different nationalities, and between that of a white man and a negro. It is a well-recognized rule of evidence that the voice is a competent means of identification. 6 Enc. of Ev. 924; *McElroy* v. *State*, 101 Ark. 301; *Commonwealth* v. *Hays*, 138 Mass. 185; *Stepp* v. *State*, (Tex.) 20 S. W. 753; *Price* v. *State* (Tex.) 34 S. W. 622; *Mahoney* v. *State*, (Tex.) 98 S. W. 854.

On the trial of the case, the defendant became a witness in his own behalf. Upon his cross examination, he was asked relative to his illicit relations with a negro woman. We do not think that the court committed error in allowing these questions to be propounded to and answered by the defendant. It has been repeatedly held by this court that, when a defendant becomes a witness in his own behalf in a criminal case, he is subject to all the rules applicable to other witnesses, and his testimony may be discredited and impeached like that which is given by any other witness. A defendant in a criminal case testifying in his own behalf may be cross examined as to specific acts of immorality. *McCoy* v. *State*, 46 Ark. 141; *Lee* v. *State*, 56 Ark. 7; *Holder* v. *State*, 58 Ark. 478. In the case of *Hollingsworth* v. *State*, 53 Ark. 390, this court said: "It is always competent to interrogate a witness on cross examination touching his present or recent residence, occupation and associations; and if in answer to such questions the witness discloses that he has no residence or lawful occupation, but drifts about in idleness from place to place, associating with the low and vicious, these circumstances are proper for the jury to consider in determining his credibility." And in that case it was held that these matters may be adduced in evidence upon the cross examination of the witness. *Ware* v. *State*, 91 Ark. 555; *McAlister* v. *State*, 99 Ark. 604.

Similar objections were made to like questions asked of other witnesses for defendant upon their cross examination.

For the same reason, we do not think the court committed error in overruling the defendant's objections thereto.

It is urged that the court erred in permitting the State to prove by the witness Steve Smith, called by the State in rebuttal, that the deceased, while in the office of the physician at Dumas and just before the operation was performed, and before he was told that he was seriously hurt, stated that Rhea was in the mob that shot him. The defendant had introduced as a witness one Mid Roberson, who testified that he was present at this time, and that the deceased then said, over and over, to everybody who asked him whether Rhea was in the mob, that he did not know and knew nothing about a mob. Thereupon the State introduced the witness Steve Smith. In admitting the testimony of this witness, the court stated that it was admitted only by way of impeachment of the testimony given by the witness Roberson, and not as evidence of a dying declaration made by the deceased. In this ruling we are of the opinion that the court committed no error. While this testimony relative to the statements made by the deceased was not admissible as a dying declaration, yet we are of the opinion that it was admissible to contradict the testimony which had been given by the witness Roberson on behalf of the defendant.

There are other alleged errors pressed on our attention by counsel for defendant which, it is urged, the court made in its rulings on the admissibility and rejection of certain other testimony. We have examined each of these, and we do not consider them of sufficient importance to here set them out or to discuss them in detail. We do not think that any error was committed by the court in any of these rulings which was prejudicial to the rights of the defendant.

The court refused, after the defendant had closed his case, to permit certain witnesses to testify relative to the good character of the defendant. A number of witnesses, probably sixteen, had already testified to his good character, and this desired testimony was simply cumulative. We are of the opinion that the question of permitting these two witnesses to testify at this time in the progress of the trial was within the discretion of the trial judge, and we

do not think that this discretion was abused by the ruling which he made.

3. The court gave the following instruction to the jury which, it is urged by counsel for defendant, was erroneous and prejudicial: "15. In regard to the evidence given of the defendant's character for peace and quietude, this is always admissible in behalf of a defendant accused of crime, and is not to be ignored, but such good character, if proved, is not, of itself and alone, a defense or justification or excuse for committing a crime, but should be considered by the jury along with the other evidence in the case in determining whether or not the defendant is, in fact, guilty as charged." It is contended that the instruction is misleading, and disparaged substantive evidence of the defendant's good character by incorporating therein the statement that such good character, if proved, is not of itself and alone, a defense or justification and excuse for committing a crime. Evidence of a defendant's good character should be taken into consideration by the jury in connection with the other evidence in the case in passing upon his guilt or innocence. But we think that the plain meaning of the instruction which was given by the court is that if, upon the whole evidence, that of good character among the rest, the jury believed that the guilt of the defendant is proved beyond a reasonable doubt, then the defendant's good character would not constitute a defense. This is clearly the law, and we do not think that the court erred in giving the above instruction. *People* v. *Sweeney,* 133 N. Y. 609; *Remsen* v. *People,* 43 N. Y. 6.

It is strongly urged that the court committed a prejudicial error in including the following in its charge to the jury: "7. An accessory is he who stands by, aids, abets or assists, or who, not being present aiding, abetting or assisting, hath advised and encouraged the perpetration of the crime." The defendant could only be convicted under the indictment in this case by reason of the fact that he was actually present at the time the crime was committed and participated therein, or, being present, did aid and abet, or was ready and consenting to aid and abet, in the perpetration of the crime. If he was actually absent at the time the crime was committed, he could not be convicted under this indictment, although he did

advise and encourage its perpetration. It would, therefore, be error prejudicial to the rights of the defendant if the court instructed the jury that the defendant could be convicted of the crime charged against him if, not being present, he did advise and encourage the killing of Archard. *Smith* v. *State*, 37 Ark. 274; *Williams* v. *State*, 41 Ark. 173; *Brown* v. *State*, 55 Ark. 593. But we do not think that the court so instructed the jury, or that the jury could have been misled into believing that they were so instructed. The court gave the above definition of an accessory as it appears in section 1560 of Kirby's Digest, and, following that, gave the following definition of a principal offender, as it appears in section 1563 of Kirby's Digest: "8. All persons being present aiding and abetting, or ready and consenting to aid or abet, in any felony shall be deemed principal offenders and indicted and punished as such." Thereupon, and in the same connection, the court gave the following instruction to the jury: "9. The burden is on the State to prove every material allegation in the indictment beyond a reasonable doubt. The material allegations are: (1) That Jim Hubbard did wilfully (that is, intentionally, and not by accident), unlawfully (that is, without excuse or justification, and contrary to law), feloniously (that is, in the commission of an act made a felony by law), with malice aforethought (that is, with a corrupt and wicked intention to do evil) and after premeditation and deliberation (that is, thinking about it beforehand and resolving upon a certain course of action afterwards accomplished), shoot and kill Vital Archard. 2. That such killing occurred in Desha County, Arkansas. 3. That the defendant, W. S. Rhea, was present at the time and place of the killing, and was aiding, abetting and encouraging the said Jim Hubbard in the commission of the crime." It will thus be seen that, after the court had defined what an accessory is and what a principal is, as given by our statutes, it then specifically instructed the jury that it was incumbent upon the State to prove beyond a reasonable doubt that the defendant, Rhea, "was present at the time and place of the killing." In this connection the court further instructed the jury as follows: "13. The defendant in this case presents the defense called an alibi; that is, he denies that he was present at the time and place of the killing. The burden of proving

this is on the defendant; but if the evidence, on the whole case, raises a reasonable doubt that the 'defendant was present when the crime was committed, then you should give the defendant the benefit of the doubt and acquit." These instructions, we think, are clear and unmistakable, and from them the jury must have understood that, before they would be warranted in finding the defendant guilty of the crime charged against him, they would be required to find from the evidence beyond a reasonable doubt that he was present at the time and place of the crime, aiding and abetting in its perpetration. From these instructions, we do not think that the jury could have possibly been misled into believing that they were instructed that they could convict the defendant herein if he was absent at the time of the perpetration of the crime, even though he had advised and encouraged it. *State* v. *Privitt*, 175 Mo. 207.

There are other rulings made by the court upon instructions given and refused to which objection is made. We have examined each of these carefully in the light of the testimony adduced upon the trial of this case, and we are of the opinion that the court committed no error in any of these rulings which was prejudicial to the substantial rights of the defendant. The jury were, by the charge which was given, taken as a whole, fully and correctly instructed on every ingredient essential to constitute the crime charged against the defendant and upon every phase of the evidence introduced and of the case presented. We believe that every right to which the defendant was entitled was carefully guarded, and that by no instruction given or refused was he deprived of a fair and impartial trial.

It is finally urged that the defendant was prejudiced by the misconduct of the jury and by alleged improper remarks of the State's attorney made in his closing argument to the jury followed by improper conduct of people in the audience applauding such remarks. The alleged misconduct of the jury which is pressed upon our attention in the brief of counsel for the defendant consisted in this: It is alleged in the affidavit of a bystander that during the progress of the trial a member of the jury, in going to the toilet, paused at the door thereof and made some signal to two of the attorneys representing the prosecution, to which they made an answering signal. These two attorneys made affidavits denying in em-

phatic terms that they had any communication with any member of the jury, by signal or otherwise. We think that the testimony thus adduced before the trial judge was sufficient to warrant his finding that no communication was made by any juror with any of the attorneys for the State, by signal or otherwise. By this testimony, we are of the opinion that the State showed that no prejudicial influence was exerted over the jury in any manner, and that the integrity of the verdict is fully established. *Hydrick* v. *State*, 103 Ark. 4.

In his closing argument to the jury, the State's attorney made an appeal for the enforcement of the law, and called upon them to return a verdict of guilty, stating that he believed they would do so within thirty minutes, and return to their families, from whom they had been so long separated during the extended progress of the trial. At the conclusion of his speech urging the enforcement of the law, some of the people in the audience made applause. This was at once stopped by the court, the audience was severely reprimanded, and at the same time the court admonished the jury to pay no attention to the applause, and stated to them that the people in the audience had not heard the evidence and knew nothing of the merits of the case, and that the jury should give no significance to such action, and further instructed them that they should render a verdict solely according to the law given to them and the testimony which had been adduced before them. The record shows that the argument of the State's attorney was made in response to the argument of counsel for defendant, and we do not think it was erroneous or prejudicial. We are of the opinion that any possible prejudice that could have arisen from the ill-advised applause of some persons in the audience was entirely dissipated and removed by the prompt reprimand given by the court and its admonition given to the jury. The defendant has been represented in the lower court and in this court by eminent and able counsel, his rights have been by them closely and carefully guarded. We have given to the record a searching examination, and we are unable to find in the trial any error which calls for a reversal of this case.

The judgment must therefore be affirmed.

HART, J., dissents.