## JONES v. STATE.

### Opinion delivered January 4, 1909.

1. TRIAL—OPENING STATEMENT.—In a prosecution for murder it was reversible error for the attorney for the State in his opening statement to say: "This is not the first time the defendant has taken human life;" such statement being foreign to the issues and calculated to prejudice the jury against defendant. (Page 580.)

2. EVIDENCE—RES GESTAE.—A statement by the deceased, made a few minutes after receiving the blow from which he died, as to the circumstances of his killing, was not admissible as part of *res gestae*. (Page 581.)

3. SAME—DYING DECLARATIONS—Whether declarations were made under a sense of impending death is a preliminary question of fact for the trial judge, and his finding that they were so made will not be overturned where there is evidence to support it. (Page 582.)

4. HOMICIDE—MODIFICATION OF JUDGMENT.—Where, on appeal from a conviction of murder in the second degree, error is established, but the defendant's testimony shows that he is guilty of voluntary manslaughter, the judgment will be affirmed for voluntary manslaughter unless the Attorney General elects to have the cause remanded for a new trial. (Page 583.)

Appeal from Logan Circuit Court; *Jeptha H. Evans,* Judge; affirmed with modification.

*Sam R. Chew,* for appellant.

*Wm. F. Kirby,* Attorney General, and *Daniel Taylor,* Assistant, for appellee; *C. A. Cunningham* and *Oscar L. Miles,* of counsel.

HART, J. W. F. Jones was convicted of the crime of murder in the second degree, and his punishment was assessed by the jury at a term of twenty-one years in the State penitentiary. From the judgment of conviction a writ of error has been duly prosecuted to this court. The circumstances of the killing, as detailed by the witnesses for the State, are substantially as follows:

The defendant, W. F. Jones, was a sub-renter of the deceased, Horace Swearingen. Coot McAnnally, a brother-in-law of Horace Swearingen, went to the defendant Jones's house, about sun-up the morning of the killing to collect some money. Swearingen owed Jones about the same amount, and McAnnally proposed that he would take Jones's debt on Swearingen in settle-

ment of the amount owed him by Jones. Jones told him that "the dog-goned whelp didn't have the money." McAnnally then said that he was willing to take him. Jones replied that "the plague-goned whelp has been lying to me about that." It was then agreed that Swearingen, who owed Jones twelve dollars, should pay McAnnally the twelve dollars, and that would be a full settlement of Jones's debt to McAnnally. McAnnally then went back and told Swearingen that Jones said he had lied. On that morning Swearingen was plowing in his field about forty-nine steps away from Jones's house. Some time after McAnnally left, Jones went down to the field and talked with Swearingen awhile. Swearingen rested on his plow handles with his back to them while talking to Jones. After talking awhile, he said to Jones: "Get out of the field. I don't want to hear anything more about it," and turned to his plow. After the plow had moved about two feet, Jones walked behind Swearingen and struck him with a knife. Swearingen was not looking when the blow was struck. He died shortly afterwards. This is the statement of the circumstances of the killing as detailed by Victor Morgan, a boy fifteen years of age, who was at Jones's house, and saw the occurrence. Other evidence was adduced by the State tending to corroborate his testimony that defendant struck deceased from behind. Jones struck deceased with a long single-bladed barlow knife. The wound was in the right side just below the ribs. The incision began about one inch behind the little short rib, and extended about two inches in front of it. The wound was two and a half or three inches deep, and was fatal.

Jones testified substantially as follows: "I went into the field to have a friendly talk with Swearingen. After we had talked about various things for twenty or thirty minutes my wife called me. I got up from the ground to start home. Swearingen asked me if I said for him to pay McAnnally. I said yes, and told him of my conversation with McAnnally. When I told him I had said he lied, he called me a vile epithet, and told me I could not call him a liar. He then struck me on the side of the head and drew back to strike me again. I was standing there, and before I knew what I was doing I struck him with my knife. I weigh 178 and Swearingen about 147 pounds."

One of the attorneys for the State, over the objections of the

defendant, was permitted, in his opening statement to the jury, to use the following language: "And this is not the first time the defendant has taken human life, the testimony will show as I understand it." This was reversible error. In the case of *McFalls* v. *State,* 66 Ark. 16, the object of an opening statement was declared to be to enable the court and jury to more readily understand the issues to be tried and the evidence subsequently adduced. The scope of the opening statement should be limited to getting before the jury a detail of the testimony expected to be offered, and counsel has no right to state to the jury facts which he may not prove. The fact that the defendant had at a prior time taken human life was foreign to the issue involved in the present case and was not admissible for any purpose. It had a tendency to excite the prejudice of the jury against the defendant. This was the rule announced by the court in the case of *Marshall* v. *State,* 71 Ark. 415. The syllabus states the facts and the application of the rule as follows: "The prosecuting attorney in his opening statement stated to the jury, over defendant's objection, that he would prove that defendants had the reputation in various cities of being professional pickpockets and thieves, and that their pictures were in the rogue's gallery at St. Louis, and the court permitted the statement, saying that if the evidence became inadmissible he would exclude it. Subsequently evidence in support of such statement was held inadmissible, and the jury were directed not to consider the statement. *Held,* that the statement was prejudicial, and that the error was not eliminated by the court's charge."

Mrs. Lula Swearingen, the wife of Horace Swearingen, testified substantially as follows:

The day Horace was killed, I was at home sweeping. Our house is about 170 yards from where he was plowing. The first information I had of my husband's being hurt was when I heard him halloo. I recognized his voice, and started to the door. Before I got there, I heard him again. I ran down to the field, and saw Horace coming towards the house, and Mr. Jones going toward his house. I got to the gate, which was about fifty yards from where he had been plowing, and asked him what was the matter. He said "Oh, Bill has cut me." I asked what about, and he said: "He called me a liar, and he cut me." I opened

the gate, and then ran back toward the house. After I had gone ten or fifteen steps, I ran back to him, and by the time I got to him, he had come through the gate. I said, "Oh, why didn't you run before you let him cut you?" He said "Oh, he slipped up behind me."

The testimony shows that Swearingen, the deceased, was bleeding a good deal, and in a few minutes complained of being sick, and then became cold. He laid down and asked for his father and brothers, saying that he wanted to tell them good bye, and died in a few minutes thereafter.

It is insisted by the State that deceased's statement as to the circumstances of the cutting was admissible on the ground that it was part of the *res gestae.* We think it was a narration of a past transaction, and not a part of the *res gestae.*

Counsel for the defendant also insist that the statement of deceased was not admissible as a dying declaration because it was not made under a sense of impending death.

Whether declarations were made under a sense of impending death is a preliminary question of fact for the trial judge, and his finding to that effect will not be overturned where there is evidence to support it. *Newberry* v. *State,* 68 Ark. 355; *Dunn* v. *State,* 2 Ark. 229; *Evans* v. *State,* 58 Ark. 47. In the latter case the court said: "'It is within the province of the court to hear the circumstances under which the declarations were made and to determine whether they are admissible. But after they are admitted it is within the province of the jury to weigh them and the circumstances under which they were made, and give to them only such credit, upon the whole evidence, as they may think they deserve." Swearingen suffered acute pain from the time he received the wound until his death, which occurred shortly afterwards. In a very few minutes after making the statement he called for his father and brothers to bid them good bye. His wound was bleeding profusely, and he died within ten minutes after calling for them. If, on a trial anew, the judge shall make a finding to the effect that the statement is admissible as a dying declaration, we think the circumstances under which the declarations in question were made are sufficient to sustain the finding of the judge on that point.

The defendant's own testimony shows that he is guilty of

manslaughter, and his counsel admitted that fact in his oral argument before the court.

The judgment will be affirmed for manslaughter, and the punishment fixed at seven years, unless the Attorney General shall elect within fifteen days to take a new trial, in which event the judgment will be reversed and the cause remanded for new trial.   See *Warren* v. *State, ante* p. 322, and cases therein cited.