## CANTRELL *v*. STATE.

## Opinion delivered March 1, 1915.

1. CRIMINAL LAW—HOMICIDE—EVIDENCE.—Evidence that after deceased was shot, and taken into his house, that his wife, at his request, brought him his pistol, is admissible as showing that he was not armed when he was shot; but statements by him that he was afraid appellant would come in and kill him, are inadmissible.

2. EVIDENCE—HOMICIDE—DYING DECLARATIONS.—Evidence of a dying declaration is admissible when it appears deceased did not have any hope of recovery, although he introduced his statement by saying, "If I am going to die, I might as well die first as last." In passing upon the admissibility of evidence of a dying declaration, the court should take into account all the circumstances, including everything that was said on the subject.

3. EVIDENCE—DYING DECLARATIONS—QUESTION FOR JURY.—The weight to be given dying declarations as evidence, is a question of fact for the jury, and not one of law for the court.

4. CRIMINAL LAW—CONSPIRACY—EVIDENCE.—Admissibility of proof of a conspiracy to commit murder is a preliminary question to be passed upon by the court, and when evidence is offered which is sufficient to make a *prima facie* showing of the existence of such conspiracy, then evidence of all the acts and declarations of a conspirator during the progress of the conspiracy is admissible against a co-conspirator.

5. HOMICIDE—INSTRUCTIONS.—In a prosecution for homicide, the instructions given by the court held to sufficiently present the law to the jury to enable the jury to apply the law to the facts and circumstances in proof.

Appeal from Crawford Circuit Court; *James Cochran,* Judge; affirmed.

STATEMENT BY THE COURT.

Appellant was indicted at the November, 1914, term of the Crawford circuit court, charged with the crime of murder in the first degree, alleged to have been committed by shooting one Bose Mullens with a gun. The shooting occurred on August 18, 1914. Upon his trial appellant was convicted of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for a period of six years and this appeal has been prosecuted from the judgment of the court sentencing appellant in accordance therewith.

The evidence on the part of the State is to the effect that appellant and deceased had had a previous difficulty, and there was bad blood between them, and that deceased, with his wife, mother and baby, were at church on the night of the shooting, where they remained until the services were over, shortly before midnight. That deceased, with his family, lived about three-quarters of a mile from the church, and they had gotten to within thirty or forty yards of his home, when they turned into a trail which led from the road to his home, and that just as they left the road appellant and his brother, Jeff Cantrell, came in ahead of them, singing and whistling vulgar songs. Deceased had been carrying his baby, but gave it to his wife, to whom he remarked, "I am going to get them to hush." Deceased spoke to appellant, who said, "I wasn't talking to you, I was talking to Jeff," whereupon deceased said, "If you were not talking to me, all right, I will go into the house," and, as he started to do so, Jeff Cantrell said, "Shoot him, Melvin," after which three shots were fired in rapid succession, followed by others to the total number of about ten.

It is insisted on the part of the State that the shooting was preconcerted and that appellant and his brother overtook deceased and brought on the difficulty, and shot deceased, without cause or provocation.

The evidence on the part of appellant is to the effect that he, too, had been at church on the night of the shooting and that he and his brother went by the deceased's home, because it was the nearest way to their own home, and that they had passed deceased and his family, when deceased ran after them and, upon overtaking them, demanded that they "Hit a run," and threatened to shoot them upon their failure to run away and brought on the difficulty by striking appellant with his pistol, and by shooting at him and his brother, and that appellant was finally compelled to shoot deceased to save himself. Appellant insists that his brother fired none of the shots; while the evidence on the part of the State is to the effect that all of the shots were fired by appellant and his brother, and that deceased was unarmed. The State's evidence was further to the effect that deceased's wife and mother assisted him into his house, where he requested them to make him a pallet and to get his pistol and place it by his side for the reason, as stated by him, that he was afraid appellant and his brother would return and kill him. Upon appellant's motion the court excluded the evidence that deceased said he was afraid appellant and his brother would return, and that he wanted to protect himself; but refused to exclude the evidence that deceased's wife got the pistol and placed it by him on the floor.

A statement, alleged to be a dying declaration, was made on the night of the 1st of September by the deceased, but his death did not occur until the morning of the 4th thereafter. The admission of this statement is assigned as error. The deceased was shot three times, but two of his wounds were not serious. The third shot entered the body between the ninth and tenth ribs, and the deceased physician advised him that gangrene had set up and that his case was hopeless. The physician made this statement shortly before the alleged dying declaration was made, whereupon deceased said, "Doctor, you ought to know; I will take your word for it." This alleged dying declaration was reduced to writing by a wit-

ness named Hobbs, and there was proof that, when he approached deceased to write down his statement, deceased said, "If I am going to die, I might as well die first as last." The witness Hobbs, who wrote the dying declaration, was a justice of the peace, and testified that, before deceased made this statement, he asked his physician if there was really no hope for him and, being told there was none, he said that, if he was going to die, "the quicker the better; it didn't matter how soon," as he appeared to be suffering. The dying declaration was reduced to writing, is in narrative form, and the deceased speaks in the first person, and the declaration is prefaced by the recital of the doctor's statement and the declarant's reliance upon it.

Over the objection of appellant the State was permitted to prove, by a witness named Collier, that he had a conversation with Jeff Cantrell at the church the night Mullens was shot, in which conversation Jeff Cantrell told him he had a pistol hid on the road home and that, if he would listen, he would hear it pop after the services were over.

The court, upon its own motion, gave an elaborate charge, consisting of thirty instructions, which covered every question involved in the case. No question is made about the correctness of any of these instructions. Indeed, they declare the law as it has been announced in many decisions of this court, and it is only urged that they were too general in their nature and that certain concrete instructions asked by appellant should have been given.

*Sam R. Chew,* for appellant.

The court erred in admitting the paper, purporting to be the dying declaration of the deceased, over the objections of the defendant. 2 Ark. 229; 68 Ark. 355; 81 Ark. 417; 104 Ark. 161; 99 Ark. 208; 58 Ark. 47; 1 Greenleaf on Evidence, vol. 1, (14 ed.), § 158, and authorities cited.

The dying declaration was reduced to writing, but was *not* signed by deceased, hence it was not competent and should not have been admitted. 103 Ark. 21.

The court erred in admitting the evidence of Mrs. Pollock, Wilbur Collier and I. M. Covington, it being no part of the *res gestae,* and was incompetent, inadmissible and prejudicial. 32 Ark. 220; 92 Ark. 586; 59 Ark. 422; 77 Ark. 444; 87 Ark. 34; 37 Ark. 67; 73 Ark. 152; 76 Ark. 487.

Instructions Nos. 10 and 11, requested by defendant, should have been given. 69 Ark. 134; 96 Ark. 206; 82 Ark. 499; 100 Ark. 132. Instruction No. 14, requested by defendant, should have been given. 62 Ark. 286; 95 Ark. 428; 58 Ark. 57; 58 Ark. 544.

*Wm. L. Moose,* Attorney General, *Jno. P. Streepey,* Assistant, for appellee.

The evidence was sufficient to warrant the court in admitting the dying declaration of the deceased, which was read to the jury. 109 Ark. 510; 113 Ark. 142; 172 S. W. (Ark.) 876.

The court did not err in admitting the testimony of Mrs. Pollock, Wilbur Collier and I. M. Covington.

The instructions given by the court covered every phase of the case. 109 Ark. 474, 479; Jacobson's Criminal Digest, p. 608, and authorities cited; 172 S. W. 876.

SMITH, J., (after stating the facts). (1) The court properly excluded the evidence of the statement of deceased that he was afraid appellant and his brother would return and finish him. But we think no error was committed, under the circumstances, in admitting the evidence that deceased's wife brought his pistol and laid it by his side. The proof on the part of the State was to the effect that deceased, not only did not fire any of the shots, but that he was unarmed, and the evidence that his pistol was brought to him after the shooting was over was competent to show that he was not armed during the difficulty.

We think the court committed no error in admitting the proof of the dying declaration. The admissibility

of such evidence is a preliminary question to be determined by the court, after a consideration of the proof of the conditions which make such evidence admissible. The case of *Rhea v. State,* 104 Ark. 176, reviewed a number of the decisions of this court on this subject and quoted with approval the following language from *Dunn v. State,* 2 Ark. 229.

"The only satisfactory principle upon which the dying declaration of a person deceased can be admitted to establish the circumstances of his death appears to us to be that they were made at a time when, in the mind of the deceased, all expectation of recovery was yielded up and supplanted by the conviction that he would certainly die by reason of the injury received and under which he then languished; * * * and, therefore, to warrant their admission, it must be shown, in the first place, that the declaration was made under an apprehension of impending death. This may be collected from the nature and circumstances of the case, although the declarant did not express such an apprehension, nor is it essential that the party should apprehend immediate dissolution."

(2) As has been said, no question would be made as to the competency of this evidence but for the fact that deceased, in speaking of his death, said: "If I am going to die, I might as well die first as last." The conjunction "if" is frequently employed where doubt is entertained, but its use is not conclusive of the existence of doubt. Its dictionary meaning is: "In case that; granting, allowing or supposing that; on condition that; used in introducing a conditional sentence or clause; as I will go if you do; if he is there, I shall see him." Century Dictionary.

(3) Proof of other statements by deceased, contemporaneously with the above, tend to show that deceased did not entertain the hope of recovery. In passing upon this question it was proper for the court not to limit its consideration to the single sentence but to take into account all of the circumstances, including

everything that was said on that subject. It would not be improper, if the court was requested so to do, to instruct the jury upon what theory such evidence was admissible and to tell the jury, if they did not believe the statement was made in view of impending death, that such statement should not be considered. Under any circumstances the weight to be given such evidence is a question of fact for the jury, and not one of law for the court. It is the duty of the court to require proof of the conditions which make such evidence admissible and to pass upon the *prima facie* sufficiency of such proof, but the jury must determine what weight, if any, to give to such declaration.

(4) We think no error was committed in admitting proof of the statements made by Jeff Cantrell, at the church, before the shooting occurred. This evidence, of course, is admissible against appellant only upon the theory that the brothers had conspired together to do an unlawful act. The rule in such cases is well defined and has been announced in a number of the decisions of this court. The proof of such conspiracy is another of those preliminary questions to be passed upon by the court, and where evidence is offered which is sufficient to make a *prima facie* showing of the existence of such conspiracy, then all the acts and declarations of each conspirator, during the progress of the conspiracy, are admissible against his coconspirator. It is not often that these conspiracies can be shown by express agreement. Their existence is more often shown by the proof of circumstances, the concurrence of which leads one to believe that the parties are acting from a common unlawful motive. The proof upon the part of the State would support the finding that appellant and his brother, overtook deceased for the purpose of bringing on a difficulty, and that, without cause or provocation, Jeff Cantrell called upon appellant to shoot deceased. And this direction was obeyed and the shooting followed, in which both of the brothers participated. It was not an unfair inference that this shooting was the thing meant by Jeff

Cantrell when he stated at the church that his gun would be heard to pop after the services. *Chapline* v. *State,* 77 Ark. 444; *Cumnock* v. *State,* 87 Ark. 34.

(5) Appellant very earnestly insists that the court erred in refusing to give instructions numbered 10 and 11 requested by him, and he says this is true because these were concrete instructions and undertook to apply the law specifically to the facts in issue. It is proper always to give concrete instructions, and such instructions are always to be preferred to those which only declare the law in general terms. Indeed, the failure to give a concrete instruction is not cured by the giving of a general instruction, unless the general instruction declares in unambiguous terms the principles of law which the jury should apply to the concrete facts. The purpose of all instructions is to enable the jury to apply the law to the facts and circumstances in proof, and the test of the sufficiency of any instruction is, Does it accomplish this purpose? If it does not, the failure to give a correct concrete instruction would be error calling for the reversal of the case, even though the general instruction contained a correct statement of an abstract proposition of law. But, in the application of this rule to the facts of any case, the jury must be credited with ordinary intelligence and with the purpose of administering the law. And we think under the facts of this case the jury had only to pass upon the question of the veracity of witnesses to discharge their duty under the law. Among other instructions given by the court was one numbered 15, which reads as follows:

"No one in resisting an assault made upon him in the course of a sudden brawl or quarrel, or upon a sudden encounter, or in a combat on a sudden quarrel, or from anger suddenly aroused at the time it is made, is justified in taking the life of the assailant, unless he is so endangered by such assault as to make it necessary to kill the assailant to save his own life, or to prevent a great bodily injury, and he employed all the means in his power, con-

sistent with his safety, to avoid the danger and avert the necessity of killing. The danger must apparently be imminent, irremediable and actual, and he must exhaust all the means within his power, consistent with his safety, to protect himself, and the killing must be necessary to avoid the danger. If, however, the assault is so fierce as to make it, apparently, as dangerous for him to retreat as to stand, it is not his duty to retreat, but may stand his ground, and if necessary to save his own life, or to prevent a great bodily injury, slay his assailant.''

Another instruction, numbered 14, was a very clear and full declaration of the right of a person assaulted to act upon the circumstances as they appeared to him. Under the evidence upon the part of the State, appellant was guilty of a higher grade of homicide than that for which he was convicted; while under that of himself and his brother he fired the fatal shot in his necessary self-defense; and we think the fifteenth instruction above set out sufficiently declared the law to enable the jury to pass upon those questions of veracity. Of course, cases might arise where the orderly administration of justice would require the court to declare the law of self-defense in a more concrete form than that contained in this fifteenth instruction; but we think there was no such necessity under the evidence in the present case, and that no prejudicial error resulted from the court's failure to give appellant's instructions numbered 10 and 11, even though they were held to be correct declarations of the law.

Other questions are raised in the brief, but we find it unnecessary to discuss them here. Finding no prejudicial error in the record the judgment of the court below is affirmed.