FREELS *v*. STATE.

## Opinion delivered July 2, 1917.

1. CRIMINAL LAW—CONDUCT OF JURY—DISCRETION OF TRIAL JUDGE.— A trial judge, in a criminal prosecution, has a wide discretion to keep the jury from coming under any influence which will prejudice the defendant's case, and to set aside a verdict, where something has occurred calculated to produce an improper verdict.

2. CRIMINAL LAW—MISCONDUCT OF JURY.—A new trial will not be granted merely because the jury, in a capital case, in a body, walked through the cemetery where deceased was buried, while being out for exercise by permission of the trial court.

3. EVIDENCE—DYING DECLARATIONS.—Whether declarations are made under a sense of impending death so as to render them admissible as dying declarations is a preliminary question for the trial court, and its finding will not be disturbed if there is evidence to support it.

4. EVIDENCE—DYING DECLARATIONS.—Statements made by deceased after he was shot, as to the circumstances under which he was wounded, made under the belief that he was going to die, are admissible in a prosecution for his murder.

Appeal from Mississippi Circuit Court, Osceola District; *W. J. Driver,* Judge; affirmed.

*Rice Pearce* of Tennessee and *S. L. Gladish,* for appellant.

1. Appellant did not get a fair and impartial trial. Any misconduct of the jury presumptively vitiates the verdict. The jury were permitted to ramble around in Violet Cemetery and look at the freshly-made grave ·of the deceased, etc. Mrs. Sullinger also sat by the side of the State's attorney during the trial.

During the argument of counsel for the State, admonished the jury to go to Violet Cemetery and look upon the freshly-made grave of Edrington and think of his last words, ''He shot me while I was begging him not to and I had my hands to my face.'' No one can know what influence this improper conduct and remarks had with the jury. 109 Ark. 193; 12 Am. & E. Ann. Cas. 176; 129 Ga. 425.

2. The court improperly admitted dying declarations. 125 Ark. 209; 1 R. C. L. 537-9; 90 S. W. 311; 24

*Id.* 229; 23 So. 77; 11 Coxler C. 250; 1 R. C. L. 545; 12 Atl. 701; 36 S. E. 434; 46 S. W. 127; 12 Bush, 271. The statements or declaration were not made when deceased realized that death was certain and imminent.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for appellee.

1. The affidavits of the three jurors were not admissible and can not be considered to impeach the verdict. Kirby's Digest, § 2423; 109 Ark. 193; 191 S. W. 226; *Turner* v. *State,* ms., June 18, 1917. The other affidavit shows no merit in appellant's contention that the incident vitiates the conviction. 12 Cyc. 669, b; 5 N. D. 516, 564; 126 N. C. 1095; 74 Mo. 292; 65 N. H. 221; 96 Iowa, 188; 42 N. Y. App. Div. 392; 109 Ark. 149. Nobody was guilty of any culpable conduct. The whole matter was within the sound discretion of the court below. 26 Ark. 334; 28 *Id.* 155; 40 *Id.* 454; 29 *Id.* 248; 104 *Id.* 212; 84 *Id.* 572; 65 N. H. 221.

2. The dying declarations were properly admitted. Deceased was conscious of impending death. 2 Ark. 229; 58 *Id.* 47; 1 R. C. L., § 81; McKelvey on Ev., § 186; 127 Mass. 455; 121 Mo. 434; 89 Va. 171.

WOOD, J. Appellant was convicted of murder in the second degree under an indictment in proper form charging him with murder in the first degree, in the killing of one James Edrington.

The testimony on the part of the State tended to show that three men, one Ferguson, James Edrington and one George, had been playing at a game of dice. The men were drinking and Freels was drunk. They got into what is termed in the evidence as a "friendly drunken row." The men at the time were on a place occupied by Freels, and not far from Freels' house.

George testified that Freels had a bottle of whiskey and passed his bottle often. Edrington gave Freels $2 for the bottle of whiskey, just to keep it, not to buy it. Freels decided he wanted the whiskey back; so he pushed Edrington over and got hold of it. They had a scuffle.

Edrington was laughing at the time. Freels seemed to be a little "sore." Edrington told Freels that he was a good friend of his, but wanted him to let him alone about the whiskey. Edrington hit him in the face, not very hard. Freels got up and came towards Edrington. Edrington shoved him back the second time and told him to behave himself, and hit him rather hard. Freels started down the road. Edrington overtook him, caught him by the arm, and Freels jerked loose from him. Freels went to his home and came back. Witness then tells about a controversy between himself and Freels, and continues: "About this time Jim Edrington was driving down the road in a buggy, and told Freels not to shoot him, and drove on down until he got within about twenty steps of him; then Freels leveled the gun on Edrington, Edrington threw his hands over his face, telling Freels not to shoot him, but kept going towards Freels, and when he got within twelve feet Freels fired."

Another witness testified that at the time the shooting occurred Edrington was not making any demonstration whatever. "When Freels shot Edrington had his hands over his face, laying over in the buggy; the top of the buggy was down."

The above sets out enough of the testimony to show the circumstances of the encounter from the viewpoint of the State.

It was contended on the part of the appellant (and testimony was adduced by him tending to prove) that no row occurred between Edrington and Freels; that Freels, Edrington and George, who were in a buggy going to Freels' place, got out of the buggy when they arrived at a certain point on Freels' place for the purpose of engaging in a game of dice; that no row occurred between Edrington and Freels, but that Freels went to sleep soon after they got out of the buggy, because he was so drunk, and that when he woke he went to the house after his gun at the suggestion of Jim George for the purpose of joining one Pittman in a hunt on the following Sunday; that George had taken some money from Freels

.while he was asleep; that Edrington followed Freels for a distance and told him that George had taken his money, and told Freels to make George give it to him. Freels .returned with his gun and demanded of George that he give him the $25 that he had taken from him while he was asleep. George pulled out the money to give it to Freels, but instead of giving it to him he grabbed the .gun and in the scuffle that took place over the gun the same was accidentally discharged and inflicted the wound in James Edrington's arm and shoulder.

Edrington was taken to a hospital in Memphis. Two physicians and surgeons attended him. He lingered.for thirty-nine days and finally died. One of the surgeons who attended him at Memphis testified that the cause of his death "was septicemia following the gunshot wound." This surgeon testified that the wound began about three and a half inches down from the shoulder and ranged upward through the shoulder. Witness didn't think it would have been in favor of the deceased to have cut his arm off at the shoulder.

A physician and surgeon introduced on the part of appellant testified, in answer to a hypothetical question setting forth the nature and condition of Edrington's injury, that the only treatment that should have been given and the operation that should have been made was to have taken the arm off at the shoulder and to have removed all foreign matter; that the fact that he lived so long would have been in his favor, and that he more than likely would have recovered had his arm been amputated. The lacerated flesh and foreign matter would have a tendency to bring about and set up septicemia. The witness, on cross-examination, testified that the doctors who treated Edrington in Memphis stood high as physicians.

The physician who administered first aid to Edrington on the ground after he was shot, testified that it was understood that they would take Edrington to Memphis. He administered a hypodermic to overcome the shock. It would probably last three hours, and was given him about thirty minutes before they started to Memphis. It

would have a quieting effect on the patient. Edrington didn't think he would get well. Said Freels shot him, and shot him for nothing. He was under the influence of liquor at the time he made this statement, and it was such that those present would recognize it. The influence of the liquor lasted him until he got to Memphis.

A witness by the name of Goodman testified that Edrington made statements to the witness about dying; never did say anything except that he was going to die. When witness had this talk with him he was conscious. He told the witness that when witness met him at the train when he arrived at Memphis, and also the next morning when he was operated on. Witness tried to talk him out of it, but he insisted that he was going to die. Said the man shot him for nothing, and he asked him not to, and begged him not to shoot. Edrington never changed his statement, but repeated it. Witness did not know whether they gave him opiates or anaesthetics, and didn't know whether he was under the influence of those things at the time he made the statements or not. He talked rational to witness for ten days. After ten days his mind became flighty; didn't seem to be anything wrong with his mind the first ten days.

S. E. Edrington, the father of deceased, testified that he saw his son before he was taken to Memphis on the afternoon that he was shot, and went to see him at the hospital several days after the shooting, and talked to him about the result of his wound, and he said he was going to die; didn't express any hope of getting well at all. Said he was worse than they thought he was. Said Freels shot him for nothing; that when he saw he was going to shoot him he fell over in the buggy and threw his hands up to keep Freels from shooting him in the face. It was about two or three days after the shooting before witness had the conversation with Edrington in the hospital at Memphis. He never said he could get well. Witness was asked who brought the conversation up and answered as follows: ''I talked to him this way: 'Was getting a lot better; going to get well; getting along all

right.' He said, 'No, Papa, I can't get well. I will never get well.' That was possibly two or three days after the shooting.''

The jury took the case under deliberation about 9:30 o'clock Wednesday evening. They considered of their verdict until about 12 or 12:30 o'clock that night, when they retired. On Thursday morning the jury was permitted to go through Violet Cemetery, at the town of Osceola, where deceased was buried. As they walked through Violet Cemetery, they saw one Mrs. Chas. E. Sullinger, a relative of the deceased, sitting on the curbing around the lot where her mother was buried, and adjoining her mother's lot was the grave of James Edrington. Mrs. Sullinger had her head in her hands and was weeping. Mrs. Sullinger, throughout the trial of the appellant, sat by the side of the attorneys for the State.

During the argument of J. T. Coston, who was of counsel for the State, he ''admonished the jury to go to Violet Cemetery and look upon the freshly-made grave of James Edrington and think of his last words, 'He shot me while I was begging him not to, and I had my hands to my face.' ''

Appellant's counsel urged only two grounds for reversal of the judgment:

First, that the conduct of the jury in going through the cemetery where James Edrington was buried while deliberating upon their verdict, in connection with the argument of the counsel, was prejudicial to appellant and prevented him from having a fair and impartial trial.

Second, that the court erred in permitting the declarations of James Edrington while on his deathbed to be introduced in evidence.

Concerning the conduct of the jury in walking through the cemetery while deliberating upon their verdict, Mrs. Sullinger testified that she was an aunt of James Edrington, who was buried in his father's lot in the cemetery. She was in the cemetery on Thursday morning and saw the jury. She was sitting on the curbstone at the foot of her mother's grave, which is in a lot

adjoining the lot in which James Edrington was buried. She was crying, but did not say anything to the jury nor notice them. The jury walked through the cemetery along the pathway, about thirty feet from where she was sitting and did not stop. She did not intentionally do anything for the purpose of affecting the jury. She did not know that the jury would be in the cemetery that morning. She came from her home four miles away. She hardly ever went to Osceola without going to her mother's grave. She was hard of hearing and did not hear all of Mr. Coston's argument. She did not hear him say to the jury for them to go over to Violet Cemetery and look at the grave of James Edrington and think of his last words.

The special bailiff having charge of the jury testified that on Thursday morning, after the case had been turned over to the jury the night before, he started out to give the jury a little exercise. Nobody suggested that they go into the cemetery. He was walking behind the jurors. When they got to the corner on the street where Judge Driver lived some one says, "Let's go to the cemetery." He did not think any of the jurors knew Mrs. Sullinger. They merely saw a lady sitting there. He did not know himself that it was Mrs. Sullinger. The lady was weeping and glanced around. The jury went straight on through the cemetery, and as they came back through the lady had gone. There was no effort upon her part to attract the attention of the jury. She did not speak a word to them, and the fact that she was in the vicinity of the grave of Edrington did not enter witness' mind. He heard no discussion among the jury about the presence of the lady there. He did not know where Edrington's grave was; neither did any of the jury. As they came back through the cemetery some one said, "Here is Edrington's lot here." They saw fresh tracks like some one had planted flowers. They stood there a moment or two and came back to the courthouse. Witness heard Mr. Coston's argument, and if he had been on the jury he

would not have taken the statement to mean that he should take the jury to see the grave.

This testimony shows conclusively that there was no prearranged plan on the part of the attorney and Mrs. Sullinger and the officer that the jury, while they were deliberating upon their verdict, should be conducted to the cemetery for the purpose of bringing them under any sinister influence that would be calculated to arouse their sympathies for the dead and their prejudice against the appellant, and thus to procure a verdict not in accordance with the law and the evidence.

It thus appears that Mrs. Sullinger, while the jury were passing through the cemetery, was at the grave of her mother weeping, which was also near the grave of James Edrington, her nephew. She was there to visit her mother's grave. It does not appear that the jury knew that it was the same lady who sat with the attorneys for the prosecution during the progress of the trial. Nothing was done or said by her to attract the attention of the jury. The jury did not know at the time where Edrington's grave was or the fact that she was seen weeping over or near his grave. But even if the jury had known that the lady seen by them in the cemetery was the same lady who sat with counsel for the State and thus manifested an interest in the prosecution and an anxiety for the conviction of appellant, still there is nothing in this incident of such gravity as to render abortive the trial and to call for the setting aside the verdict in this case. It would be a dangerous precedent to so hold, and would place the verdicts of juries in important criminal trials upon very slender props indeed, for it is often impossible to conduct such trials where, in one form or another, something does not occur, without design on the part of the trial court or any of those connected in any way with the trial, that would have a tendency to arouse sympathy or excite prejudice for or against the one side or the other in those who are inclined to be excessively impulsive and emotional. Every trial judge has had this

experience; and realizes that he is powerless to prevent such occurrences.

(1-2) But in all such cases the presiding judge must have a wide discretion in dealing with the situation as he finds it to prevent, where it is in his power, in the first place, the trial jury from being brought in contact with any outside conditions that are in the least calculated to exert an undue influence upon them. And in the second place, to set aside a verdict of conviction where anything occurs without his knowledge and beyond his power to prevent, that was well calculated to produce a verdict that in his judgment was tainted by passion, sympathy, prejudice, corruption, or any other sinister influence whatever, and therefore not responsive to the law and the evidence. Unless it appears that the trial judge has abused his discretion in dealing with all such matters this court, after he has ruled upon such issues, will not disturb his finding. Each case must depend upon its own peculiar circumstances, and as to whether the verdict in any case was likely the result of undue sympathy or prejudice, from any cause whatever, the jurors who rendered it must be judged by standards fixed for ordinary men.

The distinguished authors of the article on Criminal Law in Cyc. says: ''A new trial will not be granted merely because the jury in a body, while in the charge of the officer, attended a theater, or a church, walked through the jail, or had their pictures taken in a photograph gallery, or in a capital case, while taking a ride by permission of the court, were carried by the scene of the homicide, or being out for exercise were taken beyond the confines of the State or county.'' 12 Cyc. 669, b; *Palmer* v. *State,* 65 N. H. 221; *Bowman* v. *Western Fur. Mfg. Co.,* 96 Iowa, 188; *Haight* v. *City of Elmira,* 42 N. Y. App. Div. 392; *State* v. *Kent,* 5 N. D. 516, 564; *State* v. *Kinsauls,* 126 N. C. 1095; *State* v. *Baber,* 74 Mo. 292.

Even if it had been proved that the jury knew that Mrs. Sullinger was a near relative of James Edrington, and knew that she was at his grave weeping as they

passed by, the verdict could not have been set aside on that account. She sat with the attorneys for the prosecution during the progress of the trial, and had a right to do so. *Tiner* v. *State,* 109 Ark. 139, 149. There the jury must have witnessed every emotion that she exhibited showing her love and devotion to her dead relative and her anxiety that his slayer should be punished. The eloquent appeal of counsel in her presence, as set forth in the record, must have had a far more cogent effect in superinducing sympathy in her behalf than would her mere presence in the cemetery silently weeping at the grave of her loved one. Yet it could not be contended for a moment that these remarks of counsel were beyond the pale of legitimate argument.

In *Dolan* v. *State,* 40 Ark. 454, 474, this court quoted from Wharton on Criminal Law (sec. 3111) as follows: "The general rule is that the verdict will not be set aside on account of the misconduct or irregularity of the jury, even in a capital case, unless it be such as might affect their impartiality or disqualify them from the proper exercise of their functions."

We can not presume that any ordinary man, qualified to serve as a juror, would be so susceptible to mere sentimental influence as to allow this momentary graveyard scene to awaken his sympathies for the weeping relative of the deceased to such an extent as to cause him to forget the solemn obligation of his oath to try the cause and a true verdict render according to the law and the evidence.

(3-4) Second. Whether declarations are made under a sense of impending death so as to render them admissible as dying declarations is a preliminary question for the trial court, and its finding will not be disturbed if there is evidence to support it. *Fogg* v. *State,* 81 Ark. 417; *Jones* v. *State,* 88 Ark. 579; *Robinson* v. *State,* 99 Ark. 208. In determining the question the court should consider all the facts and circumstances surrounding the declarant at the time the declarations were made, such as the character of the wound, the declaration of the de-

ceased himself that he could not live, and the fact that he died shortly afterwards. *Robinson* v. *State, supra; Cantrell* v. *State,* 117 Ark. 233. The question as to the admissibility of such declarations is for the court to determine; the weight and credit to be given them is for the jury. *Rhea* v. *State,* 104 Ark. 162.

In *Evans* v. *State,* 58 Ark. 47, the declarant, after he was shot, and five or six days before he died, said he was bound to die. He said six different times that he did not believe he would ever get well. In that case, the court, speaking through Judge BATTLE, said: "The declarations of a person who has been wounded, respecting the circumstances under which the wound was inflicted, are admissible in prosecutions for the killing of such person, if made at a time when he did not expect to survive the injury, and all hope of recovery has been supplanted by the conviction that he would certainly die. The time when made need not be when the declarant apprehended immediate dissolution. But they are admissible if made at any time when he believed that death was impending and certain."

Under the above doctrine, the court certainly did not err in holding that the declarations of Edrington set forth in the statement were admissible as dying declarations. While he lived thirty-nine days after his injury before he died, yet during all that time while he was conscious at all he realized that he was going to die. He had no hope whatever of recovery, and so expressed himself to his father-in-law and his father, while they were in attendance at his bedside. He knew better than those about him that he was fatally stricken. He could feel the shots in his body and insisted from the first to the last that he was going to die. So far as he was concerned, death was impending all the while and the statements were made with a consciousness of that fact.

There is no error in the record and the judgment must therefore be affirmed.