PARKER *v.* STATE.

Opinion delivered October 5, 1925.

1. HOMICIDE—FOUNDATION FOR ADMITTING DYING DECLARATION.—Evidence *held* to establish that a sufficient foundation was laid for the introduction of a statement purporting to be a dying declaration.

2. HOMICIDE—DYING DECLARATION—INSTRUCTION.—an instruction to the jury that, before they could consider an alleged dying declaration, they must believe beyond a reasonable doubt that the declaration was made at a time when the deceased himself believed that death was imminent and that every hope of this world was gone,

and that, if the jury so believed, they should consider the offered testimony in connection with all the other evidence in the case, *held* proper.

3. Criminal law—harmless error.—One convicted of murder in the second degree cannot contend on appeal that if he was guilty of any offense it was murder in the first degree, and therefore that the verdict was not supported by the evidence.

4. Criminal law—accomplice as principal offender.—Under Crawford & Moses' Dig., § § 2308, 2309, 2311, one who stands by, aids, abets, or assists, or who is present ready and consenting to aid and abet, shall be deemed a principal offender and indicted and punished as such.

5. Criminal law—repetition of instructions.—It was not error to refuse instructions fully covered by others already given.

Appeal from Desha Circuit Court; *T. G. Parham* Judge; affirmed.

*P. L. Neville, Geo. D. Hester* and *H. H. Hays,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

Wood, J. The appellant was indicted in the Desha Circuit Court for the crime of murder in the first degree in the killing of one Jim Osborne. The testimony tended to prove that on the night of June 12, 1924, a negro by the name of "James" robbed one R. Smith in the town of Gould, Lincoln County, Arkansas. Smith related the occurrence to Jim Osborne, an officer, who, on the following morning about seven o'clock went to the home of Isaac Parker in search of "James." As he approached the home of Parker, he was shot with a double barrel shotgun and died from the effects of the wounds. As Osborne went through the gate to the Parker house, he asked the appellant if "James," the negro he was looking for, was in there, and appellant answered "No." Osborne then started toward the house, and Parker called to the other negro and said, "Here he comes; kill him." Osborne then heard the gun fire. The load struck him in the arm and side, his arm being across his side and stomach. Upon being shot, Osborne turned to run, and the negro on the inside shot him a second time.

The following document, over the objection of the appellant, was introduced in evidence:

"Dumas, Desha County, Ark.
6/16/24.

"This is to certify that as I, Jim Osborne, was going through the gate to the Parker house (this is the negro Parker who had his head tied up and supposed to have had mumps), I asked Parker if this negro I was looking for was in there, and he said 'No.' I then started towards the house, and Parker called to this other negro and said, 'Here he comes; kill him.' I then heard the gun fire, the load striking my arm and side (my arm being across my side and stomach). Upon being shot I turned to run, and he followed me up and shot me the second time. I, Jim Osborne, being in my right mind, hereby state that the foregoing is true and correct statement of facts.

(Unsigned)

"Sworn to and subscribed before me this June 16, 1924. (Signed) J. R. Moss, Justice of the Peace."

Before the above statement was read to the jury Dr. Isom testified that he had been practicing medicine and surgery since 1906 and was in charge of the hospital at Dumas, Arkansas. Some time the last of June Osborne was brought to his hospital suffering from gun shot wounds in his right arm, abdomen and back. He was shot from almost the base of the skull down to his feet. There were 25 or 50 shot in the right side of the abdomen. He lived four days after he came to the hospital and died as the result of the wounds. When he came, his pulse was hardly perceptible—there had been a considerable loss of blood. The witness told Osborne that he didn't have much chance to live. After witness became thoroughly convinced that Osborne would die, he informed Osborne that in all probability he would not get well, and told him if he wanted to state the facts to some one before he died, witness would get a justice of the peace and have him take down the statement in writing. Witness sent for

J. R. Moss, the justice of the peace, who reduced
Osborne's statement to writing as above.

The following occurred during the trial:

"The Court: When you advised that in your opin-
ion he couldn't live, and told him he had better make a
statement, what did he say? A.    He didn't say any-
thing except he wanted to make a statement. He didn't
make any manifestations. Q. How did you tell him
about the statement? A. I just told him that in all
probability he couldn't get well and asked him if he
wanted to make a statement. Q. What did he say?
A. Said he wanted to make a statement. The Court:
Your objection will be overruled and exceptions noted."

Witness further testified that Osborne didn't at any
time from the time he was carried to the hospital until
the statement was made make any different statement,
but he made the same statement several different times.
His arm had been amputated two days before his death.

The declaration introduced was made about ten
o'clock in the morning, and Osborne died about 3:00
o'clock the following morning. The deceased never told
witness that he believed he was going to die, and witness
didn't have in mind what impression he might have made
when he told him his condition. At the time he made the
statement his mind was clear, and he was not suffering
great pain.

There was further testimony on behalf of the State
to the effect that, on the morning Osborne was shot, the
appellant was at his father's house with his head tied up
with a white rag. There were four shotguns in the house,
a pistol and a twenty-two rifle. The shotguns were loaded
with buckshot. One of the witnesses who helped to take
the deceased to the hospital stated that he found Osborne
lying under a tree pretty weak from loss of blood. He
said he was shot pretty bad, and when witness picked him
up in the road Osborne said, "I am all shot to pieces—
hurry and get me a doctor."

J. R. Moss, the justice of the peace, testified that he
reduced Osborne's statement to writing in his presence

and read it over to him. Witness further testified that appellant stated at the examining trial that he was in the house at the time of the shooting.

Dr. McClenden, another physician, testified that he had been practicing medicine about 32 years. He knew Osborne, the deceased; was his physician. Osborne was brought to his office shortly after he was shot and placed on a table. He was shot twice—in the side and in the back—thirteen to fifteen shot entering his bowels. Some shot went in his arms and some in the calves of his legs. He didn't have much chance from the time he was shot. Witness didn't think he could get well and told him so, and Osborne understood what witness said. Osborne asked witness what he thought about his condition and witness informed him. Osborne did not do or say anything to indicate that he thought to the contrary. The witness was then asked to state to the jury what Osborne said to him as to how the shooting happened. "He said he was out there after this darkey. When he opened the gate and started in the yard, this boy that was being tried said to the other negro, 'There is the white son of a b—. Shoot him. You said you were going to do it.' And as Osborne started on the steps the negro shot him. He said he shot him through the door of the room of the Parker home. Osborne told witness the above probably an hour after he was shot. On cross-examination, the witness stated that Osborne called the name of the boy that shot him and said it was Isaac Parker, the one that had the mumps. But on redirect examination the witness stated that he said that it was the boy that had his head tied up who told the other one to do the shooting.

The appellant testified in substance that Osborne came to appellant's father's house where appellant was and met appellant on the outside and said, "I see that fellow inside. He has come. Tell him I want to see him, to come out. Call him." Appellant replied, "I can hardly talk, but will tell him you want him." Appellant went in the east room and lay down and about that time he heard the shot and heard the man say, "Oh, Lord, don't shoot

any more. I won't shoot you." When appellant got up, the man was going out of the front gate, and the other man was going out of the side gate to shut him off and shoot him again. Appellant didn't see "James" when Osborne said he saw him. "James" was not in the house when appellant went in—not that appellant knew of. Appellant made no remarks to "James" about shooting Osborne, and didn't know "James" had been in trouble and didn't know Osborne was an officer.

The jury returned a verdict finding appellant guilty of murder in the second degree and fixing his punishment at fifteen years' imprisonment in the State penitentiary. He was sentenced by judgment of the court to the penitentiary in accordance with the verdict, and he duly prosecutes this appeal.

1. Sufficient foundation was laid for the introduction of the statement purporting to be the dying declaration of Osborne. The trial court instructed the jury in effect that, before they could consider such evidence, they must believe beyond a reasonable doubt that the declaration was made at a time when the deceased himself believed that death was imminent and that every hope of this world was gone; that, if the jury so believed, they should consider the offered testimony in connection with all the other evidence in the case. This instruction was in accord with the law as declared by this court in several cases. *Rhea* v. *State,* 104 Ark. 162-176; *Cantrell* v. *State,* 117 Ark. 233-38; *Paul* v. *State,* 125 Ark. 209-213 and cases cited in those cases; *Alford* v. *State,* 161 Ark. 256.

In *Paul* v. *State, supra,* we said: "While dying declarations to be admissible must be made under consciousness of impending death and without expectation or hope of recovery, it is not necessary that the declarant should expressly state that they are so made, but it may also be inferred from his wounded condition and evident danger, from expressions or statements made to him or in his hearing by physicians or others in attendance, from his manner and conduct, and other circumstances."

The circumstances in the case at bar were certainly sufficient to justify the jury in concluding that the statement of Osborne was made with the consciousness that he was bound to die.

2. The testimony of the dying declarations of Osborne being admissible, those declarations were sufficient, if believed by the jury, to have warranted them in returning a verdict finding the appellant guilty of murder in the first degree. There was no evidence tending to prove that the appellant was guilty of murder in the second degree, nevertheless the jury found him guilty, thus showing that they credited the dying declarations of Osborne. We have often ruled that "one convicted of murder in the second degree cannot contend on appeal that if he was guilty of any offense it was murder in the first degree, and therefore that the verdict was not supported by the evidence." See syllabus 3 in *Freeman* v. *State,* 150 Ark. 387. Also *Rogers* v. *State,* 136 Ark. 161, and cases cited in above cases.

In *Rogers* v. *State, supra,* we said at page 174: "Where the indictment charges murder in the first degree, and the undisputed evidence shows that the accused, if guilty at all, is guilty of murder in the first degree, then it is not error for the court to refuse to give instructions authorizing the jury to return a verdict of guilty of one of the lower degrees of homicide. But, on the other hand, it is not prejudicial error for the court to give an instruction on the lower degree in such case, because the error is one that results to the defendant's advantage. While it is error to give an abstract instruction, yet, under the settled rule of this court, if it affirmatively appears that the rights of the accused are not prejudiced thereby, the judgment will not be reversed for such error."

3. In its instruction No. 7, the court told the jury in substance in the first paragraph that, if they found from the evidence that the appellant wilfully, unlawfully, feloniously, and with malice aforethought and after premeditation and deliberation shot and killed Osborne with

a shotgun, as charged in the indictment, they should find him guilty of murder in the first degree. And in the second paragraph of the instruction the court told the jury that all persons being present, aiding and abetting, or ready and consenting to aid and abet, in the commission of any felony, shall be deemed principal offenders, and indicted and punished as such; and if they found from the evidence that one "James" shot and killed Osborne with a shotgun wilfully, unlawfully and feloniously, with malice aforethought and after premeditation and deliberation, and that appellant was present aiding and abetting in the commission of the crime, or ready and consenting to aid and abet, then they should find the appellant guilty of murder in the first degree.

Under our statute, one who stands by, aids, abets, or assists, or who is present ready and consenting to aid and abet, shall be deemed a principal offender and indicted and punished as such. Sections 2308, 2309 and 2311, C. & M. Digest. In *Hunter* v. *State,* 104 Ark. 245-248, we quoted from 22 Cyc. as follows: "Where, by statute, the distinction between principals in the first and second degree is abolished, an indictment of a principal in the second degree need not aver any facts other than those requisite to an indictment of the principal in the first degree." And we continued, saying: "One present aiding and abetting the commission of a felony, formerly a principal in the second degree, is, under the statute, responsible for the result of the act done as though he had done it himself, a principal offender, and must be indicted and punished as such; and, in charging appellant with having stabbed the deceased with a knife, his act was stated according to its legal effect, and a verdict upon testimony tending only to show that he was present, aiding and abetting in the commission of the offense is responsive to the charge, and not a variance therefrom. There is no longer a distinction between principals in the first and second degree, but all are principal offenders, and are required to be indicted and punished as such." See other cases there cited.

The indictment follows the language of the statute. The testimony on the part of the State tended to prove that appellant was present, ready and consenting to aid and abet James in the killing of Osborne. The appellant, therefore, under the statute was a principal offender and was properly indicted as such. The verdict of the jury finding appellant guilty showed that they believed the testimony on the part of the State. It was wholly immaterial under the indictment and the proof on the part of the State, whether the appellant killed the deceased by actually shooting him with his own hand or whether, being present, he was ready and consenting to aid and abet James in the killing of Osborne. According to the proof on the part of the State, he was guilty of murder in the first degree by being present, ready and consenting to aid James, even though he did not actually fire the shot himself.

The second paragraph of the instruction, when considered as a whole, cannot be fairly interpreted to mean, as contended by learned counsel for appellant, that it allowed the jury to convict the appellant if they believed he was ready and consenting to aid therein, whether present or not. There was no specific objection to the phraseology of the instruction, and the only reasonable construction to be put upon it is, that the jury were authorized to convict the appellant if they believed that appellant, being present, aided and abetted, or, being present, was ready and consenting to aid and abet James in the killing of Osborne. If counsel deemed that the instruction was susceptible to the construction they now give it, they should have drawn the attention of the trial court to the language by a specific objection. See *Lockett* v. *State,* 136 Ark. 473-477. In the case of *Burnett* v. *State,* 80 Ark. 225-227, the court having under consideration an objection of similar purport, speaking through Chief Justice HILL, used the following language: "But, the court having used the exact language of the statute, which is reasonably clear, it devolved upon the appellant to point out

this formal defect if he was not satisfied that the form of this instruction correctly presented the thought of it."

The fact that the jury returned a verdict finding appellant guilty of murder in the second degree showed that they believed him guilty, and whether this improper verdict was through inadvertence or intentional, it was nevertheless a clemency exercised by the jury toward the appellant which surely was not prejudicial to any of his rights at the trial, and of which he therefore cannot complain. See *Rogers* v. *State, supra; Freeman* v. *State, supra.*

4. The court did not err in refusing to give appellant's prayers for instruction relating to the presumption of innocence and reasonable doubt. Because, although these prayers for instructions were correct, they were fully covered by instructions numbered 12 and 13, already given by the court on its own motion.

We find no error in any of the rulings of the trial court. The judgment is therefore affirmed.