CROSS *v.* STATE.

4180 143 S. W. 2d 538

Opinion delivered September 30, 1940.

*Caudle & White,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

HUMPHREYS, J. An information was filed by the prosecuting attorney of Pope county in the circuit court charging appellant with the crime of murder by killing Joe Ehemann in said county on the 8th day of November, 1939.

Thereafter, on the 18th day of April, 1940, she was tried and convicted of murder in the second degree and, as a punishment therefor, was adjudged to serve a term of five years in the state penitentiary.

From the judgment of conviction she has duly prosecuted an appeal to this court seeking a reversal of the judgment on three assignments of error contained in her motion for a new trial which was overruled by the court over her objection and exception.

The three assignments of error argued by learned counsel of appellant as grounds for a reversal of the judgment are:

First, that the trial court erred in admitting the clothing worn by the deceased to be presented in evidence after they had been laundered;

Second, that the trial court erred in admitting in evidence the statement made by Joe Ehemann before he died to his cousin, T. J. Ehemann, relative to the shooting;

Third, that the trial court erred in permitting the state to attempt to impeach appellant's testimony upon collateral matters by witnesses O. E. Bowden and Burl C. Harris.

(1) The theory of the state and testimony introduced in support thereof was to the effect that appellant shot Joe Ehemann five times in the stomach and bowels

after he had left her standing in the road, where they had been conversing, and had returned to the side or door of his truck.

The theory of appellant and her testimony in support thereof was to the effect that she was walking south and met Joe Ehemann's truck going north, and that after he passed her he stopped his truck, got out, overtook and grabbed her saying, "Wouldn't you speak to a body?" that she asked him to turn her loose, but he put his arm around her neck and kept pulling her toward him at which time she opened her handbag, took therefrom her pistol and shot him; that he then released her, turned and walked back to his truck, and that she walked on toward her home in the direction she was going when he grabbed or took hold of her. She further testified that she shot him because he looked wild, and she was afraid of him, and because she could not push him away as he was a large man and she was a small woman; that for several months he had been annoying her and trying to force his attentions upon her over her protests and against her will.

A sharp issue in the trial was whether appellant shot Joe Ehemann during a struggle or whether she was forty or fifty feet from him when she fired the shots which resulted in his death a few days thereafter.

If she shot him as she stated when he was pulling her toward him, the clothes he was wearing would likely have been powder burned, but if she shot him after he returned to his truck some forty or fifty feet distant, powder burns would not appear on his clothes.

When the clothes were offered in evidence objection was made because they had been laundered and were not in the same condition they were in when the shots were fired. We think the fact that the clothes had been washed made no difference because the witness who washed them testified that they had no powder burns on them either before or after he washed them. The court admitted the clothes in evidence for the sole purpose of tending to show whether the principals were in close

proximity or some distance apart when the fatal shots were fired.

Where the changed condition of clothing worn by deceased when killed does not prevent them from tending to prove or disprove an issue in the case, then it is proper to admit the clothes to be introduced in evidence. *State* v. *McGuire,* 84 Conn. 470, 80 Atl. 761, 38 L. R. A. (N. S.) 1050; *Pate* v. *State,* 152 Ark. 553, 239 S. W. 27. The court did not err in admitting the clothes in evidence under the rule announced in those cases.

(2) The record reflects without dispute that appellant shot Joe Ehemann about six o'clock p. m. on November 8, 1939, about two miles south of Atkins, and after the shooting he asked his brother who had been in the truck with him to hurry and take him home as he was shot all to pieces. He was taken to his father's home that was between the place where he was shot and Atkins; that he was then taken to the hospital where a transfusion of blood was administered to him, and after being put under an anesthetic an operation was performed upon him between 7:30 and 8:00 o'clock. About ten o'clock he became conscious and later or about 6:30 the next morning he made a statement to his cousin relative to the shooting which was offered in evidence as a dying declaration of the deceased to the introduction of which appellant objected. A suggestion was made that his evidence be heard in the trial judge's office in the absence of the jury. The court heard the testimony of the witness and after doing so returned to the court room and admitted the evidence of the witness as the dying declaration of the deceased. The witness stated that after the operation and after Joe Ehemann revived toward midnight he looked over at him and said: ''Did they get all the bullets out of me?'' and I said: ''Yes.'' Then I walked over to the bed and leaned over him and told him that the bullets had passed through him, then he said, ''Well, what did they say I looked like inside?'' and I said, ''To be fair with you, you are in bad shape.'' He said, ''I know I am. I am shot all to pieces.'' He shed some tears and

put his hands over his eyes like that (indicating). I put my hand on his shoulder and said, "Where there is life there is hope," and he said, "I know that I can't live. I am shot all to pieces." I said, "Go on and take some rest. I will talk to you later." I just patted him on the shoulder and told him to get some sleep.

"Q. He told you that he couldn't live? A. Yes, sir. Q. Did you talk to him any more that night? A. No, sir, not any conversation, only thing he would revive and rub his hand. I tried to get him to get as much rest as he could. Q. Any one in the room when he was talking to you? A. Let me see, I don't believe the nurse was in there. Q. Who was the nurse? A. Miss Burns. Q. The next morning did you talk to him before you left? A. Next morning about 6:30 I was getting ready to go home and I went by the bed. Joe and I were always good friends. I went over there and asked him if there was anything I could do for him. He was lying on his back. He turned over on his side and put his hand out and complained about his finger. I rubbed his finger; seemed to do him good and he said, "I've got it all figured out—." He got himself braced so he could talk and after explaining that he had gone down to his farm that morning to work he said that when he was coming back home that evening, appellant was coming down the road and knowing that she had started to Oklahoma that morning with Andrew McLaren and wouldn't be back until late that night it occurred to him that they had had an accident so he stopped, got out and went back and asked her what happened; that she replied, "None of your damn business"; that he was surprised when she answered him that way; that he had never had any difficulty with her and didn't know why she answered him that way; that he said, "What is the trouble?" and she said, "What did you mean by peeping into my window this morning"; that he said, "Of all things in the world, why do you accuse me of that, I know better than that. I haven't been peeping in your window"; that she kind of mumbled something and that he saw she was mad, and figured that she and Andrew had been arguing and that he turned and walked

off; that about the time he got up to the truck she said, "Hey, just a minute," whereupon he kind of turned and looked back and she said, "You won't peep any more," and by that time she was shooting.

The record discloses that deceased was shot five times in the middle portion of his body and that he knew his wounds would necessarily result in his death. Prior to making the statement to his cousin as to the facts and circumstances surrounding the unfortunate tragedy the deceased stated that he was shot all to pieces and knew that he could not live. The record reflects that he died within forty-eight hours after he was shot. We think the court properly admitted the statement of the deceased to go to the jury under the facts and circumstances surrounding the deceased at the time he made the statement. At the time the deceased made the statement under this record the jury might have found he was under a sense of impending death. This court said in the case of *Freels* v. *State*, 130 Ark. 189, 196 S. W. 913, that: "Whether declarations are made under a sense of impending death so as to render them admissible as dying declarations is a preliminary question for the trial court, and its finding will not be disturbed if there is evidence to support it. *Fogg* v. *State*, 81 Ark. 417, 99 S. W. 537; *Jones* v. *State*, 88 Ark. 579, 115 S. W. 166; *Robinson* v. *State*, 99 Ark. 208, 137 S. W. 831. In determining the question the court should consider all the facts and circumstances surrounding the declarant at the time the declarations were made, such as the character of the wound, the declaration of the deceased himself that he could not live, and the fact that he died shortly afterwards. *Robinson* v. *State, supra; Cantrell* v. *State,* 117 Ark. 233, 174 S. W. 521. The question as to the admissibility of such declarations is for the court to determine; the weight and credit to be given them is for the jury. *Rhea* v. *State*, 104 Ark. 162, 147 S. W. 463."

The facts and circumstances in the instant case bring it clearly within the rule announced in the case of *Freels* v. *State, supra,* and no error was committed by the trial court in admitting the statement as a dying

declaration of the deceased as to how and in what manner the unfortunate affair occurred.

(3) Appellant took the witness stand in her own behalf and testified at length relative to her acquaintanceship with Joe Ehemann and his conduct, or rather misconduct, in attempting to take liberties with her on various occasions, and, in detail, as to all occurrences during the day prior to and after shooting him. She testified that before she left Atkins, her home, between four and five o'clock on the day of the shooting she went to a small store operated by Mrs. Mary Etheridge, left her small valise there until the next day and bought a bottle of wine and took it home with her; that she did not drink any of it and that she had not drunk any intoxicants during the day and did not drink any after the shooting and prior to her arrest; that she was arrested two or three hours after she did the shooting.

Mrs. Mary Etheridge testified that after appellant left she went into the little side room where appellant had deposited her suit case and found an empty bottle resembling the bottle that had contained the wine she sold appellant.

After appellant testified on direct examination that she had bought the bottle of wine from Mrs. Etheridge she was asked on cross-examination whether she had been drinking any at all on the day of the killing and she replied that she had not.

Several hours after the killing, she was arrested by O. E. Bowden, a state patrolman, and was taken to the office of the prosecuting attorney in the court house at Russellville and was interrogated by him and other officers relative to her reason for shooting Joe Ehemann in an effort to find out whether anyone else was implicated and she refused to give him and the other officers any information as to why she shot the deceased.

O. E. Bowden was introduced by the state in rebuttal and in the course of his examination the following appears:

"Q. Did you ask her whether or not she had anything to drink? A. Yes, sir." Defendant objects and excepts. "Q. What did she say?" Defendant objects and excepts. "A. She said that after the shooting she went over to Mr. Barnes' place and drank two or three bottles of beer." (By the court): "That was subsequent to the shooting? A. Yes, sir." (By the court): "I am going to hold that is a collateral matter and the jury is not to consider that as having any direct bearing on the merits of the controversy. I admonish the jury not to consider the question and answer."

Appellant contends that the court committed reversible error because he did not direct the jury that such evidence had no bearing on the case. In other words that the admonishment of the court to the jury not to consider the evidence was not sufficient to remove the prejudice which might result to appellant from this episode. It seems to us the court said all he well could about it and that what he said did have the effect of eliminating any prejudicial impression the offered testimony might have had upon the minds of the jury.

Burl C. Harris was permitted in rebuttal, over the objection of appellant, to testify as follows:

"Q. Mr. Harris did you see Zadie Cross on the night she was arrested? A. Yes. Q. State whether or not she was intoxicated or drinking?" Mr. White: "I object, that issue is not involved." By the court: "Overruled." Mr. White: "Save our exceptions." "A. She was about three-fourths drunk, she wasn't to say stiff or down, but she had been drinking something in the way of intoxicants."

Mr. Harris was a deputy sheriff and we think when she was arrested it was perfectly proper to show what condition she was in after she herself had testified she had not consumed any intoxicants during the day either before or after the killing. We are unable to see that any prejudice resulted to her on account of Mr. Harris's testimony as to the condition he found her in when

she was arrested only two or three hours after the killing.

No error appearing, the judgment is affirmed.